732 A.2d 920

**Stephen PAGOTTO**

v.

**STATE of Maryland.**

**Nos. 424, 1571, Sept. Term, 1997.**

Court of Special Appeals of Maryland.

July 7, 1999.

272

Henry L. Belsky, (Kimberly Kelly and Schlachman, Belsky and Weiner, P.A., on the brief), Baltimore, for Appellant.

Mary Ann Ince, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on the brief), Baltimore, for Appellee.

Argued before MOYLAN, KENNEY, and RALPH M. BURNETT (specially assigned), JJ.

MOYLAN, Judge.

**The Question Before Us
In Its Larger Context**

| Intentional Murder | Unintentional Murders | | |
|---|---|---|---|
| **1.** Premeditated Specific Intent to Kill | **?** (By poison or lying in wait) | **1.** Designated Statutory Felony-Murders | **?** (By poison or lying in wait) |
| **2.** Specific Intent to Kill | **2.** Specific Intent to Harm | **2.** Common Law Felony-Murder Doctrine | **2.** Depraved Heart |
| Voluntary Manslaughter | Involuntary Manslaughters | | |
| **3.** Rule of Provocation Imperfect Defenses | **3.** Rule of Provocation Imperfect Defenses | **3.** Common Law Misdemeanor-Manslaughter Doctrine | **3.** Gross Criminal Negligence |
| Excusable Homicide | | | |
| Some Forms of Self-Defense | Some Forms of Self-Defense | NO EXCUSABLE VERSION | Unavoidable Accident or Ordinary Civil Negligence |

On the matrix of blameworthy states of mind that will support a verdict of either civil liability or criminal guilt on the part of an unquestioned homicidal agent, one of those mental states is that in which the homicidal agent causes an unintended death by carelessly or "negligently doing some act lawful in itself." *Dishman v. State,* 352 Md. 279, 291, 721 A.2d 699 (1998); *Cox v. State,* 311 Md. 326, 331–32, 534 A.2d 1333 (1988). The fault involved in such negligent conduct may come in any of three degrees. At the bottom end of the culpability scale is mere civil liability for a wrongful death, where there may be uncontestable fault and perhaps heavy civil liability but still something less than criminality. From the point of view of the criminal law, it is the level of homicide known for the last 600 years as excusable homicide. It is non-criminal.

Higher up the ascending scale of blameworthy negligence are those more "gross deviations" from the standard of care used by an ordinary person where the negligent conduct can reasonably be said to manifest "a wanton or reckless disregard of human life." *Dishman v. State*, 352 Md. at 291, 721 A.2d 699; *State v. Albrecht*, 336 Md. 475, 499, 649 A.2d 336 (1994). That level of fault constitutes involuntary manslaughter of the gross negligence variety. Yet higher still on the culpability ladder are those acts of a life-endangering nature so reckless that they manifest a wanton indifference to human life. That level of blameworthiness constitutes second-degree murder of the depraved-heart variety. Definitionally, the Maryland case law has yet provided no meaningful distinction between those last two levels of culpability. "[O]ur cases have not drawn a precise line between depraved heart murder and involuntary manslaughter." *Dishman v. State*, 352 Md. at 299, 721 A.2d 699. As an abstract matter, however, we know that there is—somewhere—such a line. There must be or else there is no legally cognizable distinction between murder and manslaughter.

In considering this appeal, our analysis will be confined exclusively to this single vertical column of ascending and descending culpability, rising from mere civil negligence at the bottom to gross-negligence manslaughter in the middle to depraved-heart murder at the top. Our concern, moreover, will be with the procedural devices that may be available to trigger or to limit movement upward and downward within that vertical column.

| |
|---|
| **CULPABLE NEGLIGENCE** |
| **Unintentional Murder** |
| 1. |
| 2.<br><br>Depraved Heart |
| **Involuntary Manslaughter** |
| 3.<br>Gross Criminal Negligence |
| **Excusable Homicide** |
| Ordinary Civil Negligence |

Is there a single, entry-level burden of production requiring a mere *prima facie* case as to some negligence with the ultimate level of culpability then being consigned to the idiosyncratic and unfettered weighing process of the fact finder? Do we simply give the jurors the appropriate definitions and turn

them loose? Or are there intermediate and progressively more demanding burdens of production that must be met by the State, as a matter of law, before the fact-finding process is even ratcheted up from one to the next higher level of possible culpability? If so, what precisely are those progressively more demanding burdens?

■ It is clear that each legally cognizable level of culpability has its own unique burden of production that must independently be satisfied before a fact finder will be permitted even to consider civil liability or criminal guilt at that level. A plaintiff, suing a defendant for an injury caused by the defendant's alleged negligence, must establish a *prima facie* case of negligence for the issue of liability even to be submitted to the jury. *Isen v. Phoenix Assurance Co.*, 259 Md. 564, 270 A.2d 476 (1970).

■ In a case charging involuntary manslaughter of the gross negligence variety, as we graduate upward, the State will not be permitted to take its case to the jury simply by proving a *prima facie* case of ordinary negligence. It must meet an additional and higher burden of production by showing such gross negligence, above and beyond mere civil negligence, as to evidence "a wanton or reckless disregard for human life." There are a number of cases where ordinary negligence has been established or assumed but where the evidence was nonetheless held, as a matter of law, to have been legally insufficient to have permitted the jury even to consider a manslaughter verdict based on gross criminal negligence. *Plummer v. State*, 118 Md.App. 244, 702 A.2d 453 (1997); *Johnson v. State*, 213 Md. 527, 132 A.2d 853 (1957); *Thomas v. State*, 206 Md. 49, 109 A.2d 909 (1954).

Although as yet no Maryland decision has had to come to grips with the issue, it is logically ineluctable that even a *prima facie* case of gross criminal negligence would not, *ipso facto,* survive a motion for judgment of acquittal on a murder count and justify submitting to the jury a charge of second-degree murder of the depraved-heart variety. A yet higher burden of production would intervene and require a *prima*

*facie* case as to some state of mind even more blameworthy than gross criminal negligence. Were that not a legal require- ment, then every case of involuntary manslaughter of the gross negligence variety properly submitted to a jury would automatically permit a verdict of second-degree murder.[1] When that issue arises as to what the precise burden of production is before the jury may even consider depraved- heart murder, the appellate courts will, to be sure, have to do some serious grappling with some treacherously ambiguous earlier language. But when that time comes, one must have faith, our courts will somehow surmount the linguistic hurdle.[2] We are relieved of that challenge in this case, however, because the State never charged the appellant with second- degree murder of the depraved-heart variety. As a purely doctrinal exercise, one wonders why. In any event, the unveil- ing of the content of the burden of production as to depraved- heart murder will have to await another day. In considering this appeal, therefore, the question of how, *prima facie*, to get to the highest level of this vertical column of culpability need not concern us.

By the same token, we need not concern ourselves with the entry-level question of how, *prima facie*, to get into the negligence column at its lowest level. Taking, as we must, that version of the evidence most favorable to the State's case, the appellant was *prima facie* accountable for ordinary civil

---

1. Assuming, of course, that murder had been charged.

2. As a practical matter, jurors and judges alike are frequently able to "sense" or to "feel" the difference between depraved-heart murder and gross-negligence manslaughter relatively easily on a case-by-case basis. The perplexing problem is that of articulating an easily applied legal criterion to explain the difference. In attempting to define that differ- ence, we share the consternation of Justice Potter Stewart in his concurring opinion in *Jacobellis v. Ohio*, 378 U.S. 184, 197, 84 S.Ct. 1676, 12 L.Ed.2d 793 (1964), as he similarly grappled with the defini- tion of pornography:

> I shall not today attempt further to define [hard-core pornography] and perhaps I could never succeed in intelligently doing so. But I know it when I see it . . .

negligence that contributed at least in part to the victim's death.

Our focus in this case, therefore, will be on the second and intermediate burden of production that must be satisfied to raise a case of *prima facie* civil negligence to the level of *prima facie* gross criminal negligence.[3] Our focus, therefore, must not be on the negligence *per se* but only on the **INCRE-MENTAL** elements or characteristics that are required to **ESCALATE** ordinary civil negligence, be it ever so grievous in its consequences, into a genuine case of gross criminal negligence. In this case, the homicidal agency of the appellant is a given. The *actus reus* of some negligence is also a given. Our attention must be on **WHAT FURTHER PROOF** is then required, as a matter of law, even to permit the jury to consider a *felonious mens rea*. Once we identify those **IN-CREMENTAL** elements that may transform a tort into a crime, we can begin to assess the legal sufficiency of the State's case to satisfy those **INCREMENTAL** elements. We will not second-guess the fact finders. Our concern is not with what the jury found but with what the judge permitted the jury even to consider. In other words, we are only concerned with the burden of production and not with the burden of persuasion.

### The Present Case

The appellant is Sergeant Stephen Pagotto, a fifteen-year veteran of the Baltimore City Police Department at the time of the alleged crimes. At approximately 8:30 P.M. on the evening of February 7, 1996, in the course of Sergeant Pagotto's performance of his police duties, a bullet from his handgun hit and killed Preston Barnes, who was behind the wheel of an automobile that Sergeant Pagotto was at that moment at-

---

**3.** The adequacy of the State's evidence to prove the necessary *mens rea* of reckless endangerment will rise or fall with the adequacy of the State's evidence to prove the *mens rea* of involuntary manslaughter. *Minor v. State,* 326 Md. 436, 440–41, 605 A.2d 138 (1992); *Albrecht v. State,* 105 Md.App. 45, 72–74, 658 A.2d 1122 (1995); *Williams v. State,* 100 Md.App. 468, 474–77, 641 A.2d 990 (1994).

tempting to stop. A Baltimore City jury convicted Sergeant Pagotto of the involuntary manslaughter of Preston Barnes and of the reckless endangerment of two other persons who were passengers in the automobile being driven by Barnes at the time he was shot.

At the end of the entire case, the appellant moved for judgments of acquittal on all three counts. The motion was denied. Although the appellant raises ten separate contentions on this appeal, our attention will turn initially to his contention that the State's evidence was not legally sufficient to have permitted those three charges to be submitted to the jury. More particularly, the contention challenges the sufficiency of the State's evidence to show a criminal *mens rea.*

## The Factual Background

In assessing the legal sufficiency of the State's evidence, we will take, as we must, that version of the evidence most favorable to the State's case. The respective versions of the case, however, do not diverge from each other until we reach the critical minute leading up to and including the discharge of the appellant's weapon. There is no dispute as to the nature of the mission Sergeant Pagotto and his partner that evening, Officer Stephen Wagner, were on as they approached what turned out to be the critical confrontation. Officer Wagner was the key State's witness in that regard and his version as to the nature of that night's assignment is not in dispute.

## The Gun Recovery Unit

Officer Wagner testified that on the evening of February 7, Sergeant Pagotto and he were both assigned to the newly commissioned Gun Recovery Unit that had been created by the Baltimore City Police Department four months earlier for the express purpose of removing guns from the street. He and Sergeant Pagotto were both assigned to the Northeastern District. As of February 7, the Gun Recovery Unit, at least as far as the Northeastern District was concerned, was just entering its second week of operation. Officer Wagner described the training film that had been shown to those officers

who were assigned to gun recovery. It informed them as to the characteristics they should look for in determining what persons or groups of persons to approach as those who were more likely than others to have guns in their possession:

> Prior to actually the first day of the gun squad, there was *a videotape made up to show characteristics of people carrying guns,* whether they are in the jacket, the way the jacket hangs, *if they are in cars, just their reaction, movements that they were doing in the car at the time, where they are placing the gun in the car just by their movements.*

> It's approximately, I would say 20 minutes to a half hour tape that we watched to get these characteristics.

> As driving around on the streets, we would watch people as standing on corners, loitering on corners, whichever, to look for those characteristics. *And that was our point to take and go and approach those people to see, to interview them and get those guns off the street.*

(Emphasis supplied).

As part of a highly publicized city-wide effort to reduce the number of guns available on the streets of Baltimore, the mission of the Gun Recovery Unit was clear:

Q: And what was the purpose of the gun squad?

A: To go out and get guns off the street.

Officer Wagner explained that on the evening of February 7, the primary mission that he and Sergeant Pagotto had was to recover guns:

> The focus was on guns. That's all we were focused on. So we weren't handling domestics or calls for service. That was our focus.

As they set out that evening to "get guns off the street," Sergeant Pagotto and Officer Wagner were in plain clothes. There was no mistaking their status as police officers, however, for they were using "a marked Tracker," which Officer Wagner described as a car having "the police striping, the

shield, and a little red light on the roof." [4] The sector of the Northeastern District which Sergeant Pagotto and Officer Wagner were patrolling that evening was that which Officer Wagner described as "the lower end ... around Harford Road, the Alameda, Clifton Park area."

Officer Wagner further described the area as one called "Little Eastern" because the area is dangerous and has a higher-than-ordinary crime rate. The State never disputed Sergeant Pagotto's description of the neighborhood as "a high narcotic trafficking area, high shooting area," or his testimony that those persons suspected of dealing in drugs are the same persons most likely to be carrying weapons because, as he explained, "guns and narcotics are synonymous with each other." One small indication of the inherently dangerous nature of the mission Sergeant Pagotto and Officer Wagner were assigned to that night was the fact that Sergeant Pagotto was wearing his "blue bullet-resistant vest."

### The Initial Automobile Stop

 It was at approximately 8:30 P.M. when the two officers spotted the white Subaru driven by Preston Barnes in the 2600 block of Kirk Avenue. The justification that presented itself for stopping the white Subaru was that the Subaru was not properly displaying a license plate.[5] Officer Wagner very candidly testified that neither he nor Sergeant Pagotto were "on traffic patrol" and that, subjectively, they were not interested in the license tag violation *per se*. Under the constitutional imprimatur of the Supreme Court in *Whren v. United States*, 517 U.S. 806, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996), however, the police are permitted to seize the opportunity presented by a traffic violation in order to accomplish

---

4. The reason they were in a Geo Tracker that evening was because "there were no unmarked cars available."

5. At trial, Sergeant Pagotto did not recall that any license plate had been on the car. Officer Wagner, on the other hand, recalled that the plate was improperly displayed inside the rear window of the car. Either scenario would have permitted the officers validly to pull over the vehicle.

some other investigative purpose or police function. A subjectively pretextual stop is permitted if it can be objectively justified. The real purpose of the stop, on the night of February 7, was to discover and to recover guns. The real purpose is important to keep in mind, because one of the State's experts incorrectly analyzed the confrontation in this case as if he were analyzing a true traffic stop.

In addition to the fact that the white Subaru was not properly displaying its license tag on the rear bumper, Sergeant Pagotto noted the further factor that it "was in a high drug gun area, and it was suspicious." He explained that it was a common *modus operandi* for those who were "dealing narcotics or doing a drive-by shooting" to "take the tag off" in order to frustrate any easy identification of the vehicle.

The white Subaru was southbound on Kirk Avenue when the two officers activated the dome light and signaled for it to pull to the side of the street. It came to a stop in the 2700 block of Kirk Avenue between Montpelier Street and Gorsuch Avenue. Sergeant Pagotto stopped the Tracker several car lengths behind it. Both officers exited the Tracker and approached the stopped Subaru from the rear, Sergeant Pagotto on the driver's side and Officer Wagner on the passenger side. Without contradiction, Sergeant Pagotto testified that as he approached the Subaru, he observed Preston Barnes tilt his head back and drop his shoulder down in such a way that the action was consistent with the picking up of a weapon or the placing of one under the seat. Officer Wagner characterized the movements of all three occupants of the Subaru as "very excited and moving" around inside the car. These movements were consistent with the profile that had been described and depicted in the training film. The two other occupants of the Subaru at the time of the stop were Damien Jackson and Ali Austin.

As the two officers approached the Subaru, several additional facts are also undisputed. The hour of 8:30 P.M. in the first week of February in Baltimore City is after dark. The only purpose for which the two officers were approaching the

Subaru at that time was because they had reason to believe that its occupants might well be in the possession of handguns. The occupants of the Subaru, moreover, outnumbered the officers, three to two.

### The Reaction Inside the Subaru

Before turning to the finer parsing of Sergeant Pagotto's movements during the minute or fraction thereof immediately preceding the discharge of his weapon, it behooves us to ascertain what was happening inside the white Subaru as it was being stopped. An appreciation of the actions of the individuals inside the Subaru, especially those of the driver Preston Barnes, and of the movement of the Subaru itself is indispensable for us to evaluate the state of mind of Sergeant Pagotto as he responded to those actions and movements. The testimony of Damien Jackson, the twenty-year-old passenger in the right-front seat of the Subaru, and of Ali Austin, the eighteen-year-old passenger in the rear seat of the Subaru, are part of the State's most favorable version of the evidence. That version, however, shows the driver's total non-compliance with the lawful order of the police to bring the car to a complete stop and to submit to questioning by the police.

Damien Jackson gave the more illuminating testimony; Ali Austin, though not testifying as fully, essentially corroborated the testimony of Jackson. Jackson established that as the three young men set out in the white Subaru that evening, one of their first activities was to drive to the home of Preston Barnes's girlfriend on Abbotston Street, where Barnes obtained ten bags of a form of cocaine known as "Ready Rock." Jackson further testified that Preston Barnes and he had jointly participated in the selling of cocaine in that form on the day before.

It was shortly after picking up the cocaine that Barnes drove the Subaru to Kirk Avenue. As soon as the police car signaled for the Subaru to stop, Barnes's first words to his companions were, "Oh, shit, I'm dirty." Barnes was already on probation for an earlier criminal conviction. Jackson testified that Barnes knew that in addition to any new charges, he

would be faced with a violation of probation with more than five years yet to be served for such a violation. "He was backing up ... more than five years." Jackson testified that Barnes put all ten bags of cocaine in his mouth. The fact that they were wrapped in cellophane was the apparent explanation for why they were not metabolized into his body.

Jackson further testified that he and Barnes had generally worked out, off and on over the preceding year, an escape plan if they were ever caught in such a situation. Recognizing that they might not successfully get away from a pursuing police car already in motion, the plan was for them, when signaled to stop, to come to an apparent stop. In response to such apparent submission, the police cruiser would itself stop and the officers would get out of the vehicle and approach the stopped car, perhaps several car lengths away. As the officers got close to the stopped car, the stopped vehicle would suddenly "rev up." The driver would "floor it" and make a getaway before the now pedestrian officers could make it back to their own vehicle, get it started again, and resume pursuit. Jackson then recounted how Barnes's handling of the white Subaru that night was completely compatible with the getaway plan they had decided upon.

## The Critical Confrontation

Our attention now turns back to Sergeant Pagotto. Whatever evidence there was of gross negligence on his part to support the manslaughter conviction or the two convictions for reckless endangerment concerned his actions within the space of a minute or less. That was the brief time period, immediately after he alighted from the police vehicle, between the moment he drew near the driver's side of the stopped white Subaru and the moment his handgun discharged. All parties agreed that as he approached the Subaru, he had withdrawn his Glock 17 automatic from its holster and carried it in his right hand. We will reduce the narration to slow motion in an attempt to capture the nuances of those critical seconds. Five witnesses, including Sergeant Pagotto himself, testified with

respect to that critical minute. We will examine the testimony of each one.

### Angela Purnell, Neighbor:

Angela Purnell, could contribute little of significance. She was the tenant of an apartment located at the intersection of Kirk Avenue and Montpelier Street. Looking out from her upstairs dining room window, located near the back of her building, she initially observed the white car that had been stopped and a police car with flashing lights behind it. She saw a person she believed to be a police officer approach the driver's side of the white car and position his arms as if he were aiming a weapon. She could hear shouts that sounded "something to the effect" of "stop the car or don't move the car." She further testified that the white car was moving or drifting forward during the entire time she was watching it and that the police officer was similarly moving at "a walking pace and he was following the car." At that point, the white car and the officer moved out of her line of sight.

Shortly thereafter, she heard a gunshot. By the time she got to her bedroom window to look out onto Kirk Avenue from the front of her building, all she could see was the gathering of "a lot of people" and of police cars several blocks further down Kirk Avenue.

### Officer Stephen Wagner, Partner:

With respect to the three closely intertwined actions that allegedly transformed the behavior of Sergeant Pagotto that night from that of a law enforcement officer to that of a criminal, the testimony of Officer Wagner was no more illuminating than that of Angela Purnell. After the white Subaru had been stopped by Sergeant Pagotto and Officer Wagner, Sergeant Pagotto alighted from the police car and approached the Subaru on what Officer Wagner described as a "car stop position." He explained:

> For that officer's safety, you don't want to stand in front of or alongside the driver. You want to stand beside him, behind him in his blind spot so if anything were—occurred he would have to turn, make motions to indicate to you that.

At the same time, Officer Wagner alighted from the other side of the police vehicle and approached the right-hand side of the Subaru, staying to the rear of Sergeant Pagotto. He was in what he referred to as the "cover position," which he also described:

> If there is a two-man unit, you want the other unit along on the passenger side or closer to the rear, depending on how many occupants are in the car, to see what the occupants are doing.

Because the Subaru was between Sergeant Pagotto and Officer Wagner, Officer Wagner could only see Sergeant Pagotto's head and shoulders. He could not testify as to whether Sergeant Pagotto had even drawn his weapon:

> From my position on the car I couldn't see the defendant's hands. And as I approached, I knew the defendant was alongside of me, but I couldn't tell what he had in his hands because my focus was on the rear of that car through that window.

*A fortiori,* he could not testify as to whether Sergeant Pagotto's trigger finger was properly or improperly placed on his weapon.

Officer Wagner did testify that as he and Sergeant Pagotto approached the Subaru, it "began drifting forward because Kirk Avenue is a slightly downgrade road right there in that block." He testified that the driver's door opened and that "there was a grinding sound as if someone was taking the gear shift and forcing it into a park position." He and Sergeant Pagotto were both "yelling orders for that car to stop, put on the brake, put it in park." He testified that the car continued drifting and then he heard the "distinct sound of [the] engine starting." At that point, Sergeant Pagotto yelled over to him, "Get the Tracker," meaning the police vehicle. Officer Wagner immediately ran back to the Tracker and opened its door. As he was entering it, he heard a gunshot. Turning back toward the Subaru, he saw Sergeant Pagotto's body falling forward from a position against the car. "He's falling forward in the direction of the motion of the car."

Officer Wagner started up the Tracker and drove it forward to where Sergeant Pagotto was lying in the street. When he discovered that Sergeant Pagotto had not been shot, they both looked forward and saw that the Subaru had crashed into a parked car approximately two blocks further south on Kirk Avenue. By the time they got to it, both Damien Jackson and Ali Austin had fled the scene.

The three actions of Sergeant Pagotto on which the State based its case of gross criminal negligence were 1) his "closing" [6] on the Subaru with his service weapon drawn; 2) his grappling with the driver, Preston Barnes, with his left hand while his gun was in his right hand; and 3) his placement of his trigger finger along the "slide" [7] of the weapon rather than underneath the trigger guard. The significance of all three actions was that they allegedly increased the likelihood that the weapon might be discharged by accident.

### Damien Jackson and Ali Austin, Passengers:

With respect to the more minute actions of Sergeant Pagotto that may have been negligent, there were two versions that differed from each other in one regard but were not otherwise contradictory. One version of events was furnished by the two passengers in the white Subaru, Damien Jackson and Ali Austin. Jackson's testimony was the fuller of the two. Austin's testimony, though skimpier, essentially corroborated that of Jackson. The other version of what happened during that critical minute was that supplied by Sergeant Pagotto himself.

Both versions were in agreement that Sergeant Pagotto, with his weapon drawn and in his right hand, "closed" to within a few feet or less of the driver's door. Neither Jackson

---

6. Officer Wagner explained that the term "closing" means to approach a suspect or target by coming within arm's length of him or her..

7. On an automatic handgun such as a Glock, as opposed to a revolver, the "slide" is a larger and flatter housing that surrounds both the barrel of the gun and other internal mechanisms. Either manually or by the firing of the gun, the "slide" slides to the rear, ejecting a spent shell, and then springs back forward, placing another cartridge in firing position as it does.

nor Austin testified with respect to the placement of Sergeant Pagotto's trigger finger on his weapon. The only testimony in that regard was that of Sergeant Pagotto himself.

Where the two versions differed with each other was with respect to the opening of the driver's door. Both Jackson and Austin testified that when Sergeant Pagotto initially approached the driver's side of the vehicle, he screamed at Preston Barnes, ordering him to stop the car. At that point, they testified, Sergeant Pagotto himself "opened up the door" [8] and then "stepped back." Although they have him "hollering" the words, "Stop the car, stop the car, or I'm going to shoot," they also have him stepping back at that point to a distance of about three feet away from the car. They both testified that at that point Barnes "hit it down," which they explained to mean "put the car from park into drive." The Subaru could not go directly forward because of a parked car blocking it in the curb lane. As the car sped up, it moved toward the center of Kirk Avenue and, therefore, toward and into Sergeant Pagotto's body. It was as it did so that Jackson and Austin heard the shot.

They testified, moreover, that it had always been Barnes's intention to ram the Subaru into gear and to make a getaway as soon as the approaching officer got close to the car. They both testified that after the car crashed to a halt two blocks down the street, they both ran from the scene.

---

**8.** Despite an apparent contradiction, the two versions of the critical events may not actually be contradictory with respect to who opened the door. Sergeant Pagotto testified that it was the driver, Preston Barnes, who initially opened the door but only to a width of approximately six inches. Fearing a weapon, Sergeant Pagotto then responded by pushing the door further open so that he could grab Barnes's arm:

A: The car door was originally opened approximately six inches. I reached in with my forearm pushing the car door open farther and grabbed onto him.
Q: Who initially opened the car door?
A: The driver.

It may have been not the initial opening but Sergeant Pagotto's responsive widening of the opening that caught the attention of Jackson and Austin.

It is also noteworthy that the testimony of neither Damien Jackson nor Ali Austin indicated that Sergeant Pagotto ever engaged in any grappling or wrestling with Preston Barnes at all, let alone a left-handed grappling while still carrying his Glock automatic in his right hand. They both indicated that Sergeant Pagotto "opened the door and stepped back, walking along the car." The only evidence of what the State characterized as an ill-advised and reckless effort at "vehicular extrication" came from Sergeant Pagotto himself, who, however, cast his brief physical struggle with Preston Barnes in a very different light than the act of swashbuckling bravado suggested by the State.

### *Sergeant Pagotto:*

The only version of the critical confrontation that referred to any physical contact between Sergeant Pagotto and Preston Barnes was that supplied by the testimony of Sergeant Pagotto. According to that version, Sergeant Pagotto did not himself initiate the physical contact by opening the driver's door of the Subaru in an effort to pull Barnes out of the car. Instead, he reacted only defensively when, to his surprise, the door suddenly sprang open and he feared he was about to be shot. His instinctive reaction was to move forward and grab the arm of the person he thought was about to shoot him.

Q: What was the next thing you did after pulling the gun from the holster?

A: I took about two or three more steps toward the car, and got to about the back door on the driver's side ... and that is when the door sprung open.

Q: What were you thinking when that door sprung open?

A: I was thinking I was going to get shot.

Q: Why?

A: Because I have had training and saw videos where a ... door would open up ... and there would be a shotgun right inside the door ... When an officer approaches, because everybody knows that an officer usually approaches close to the vehicle, the shotgun

goes off and kills the officer. I also saw the video showing officers being killed as they approached. I just thought at that point in time, I was going to get killed.

Q: Is that what was going through your mind at that time?

A: Yes, ma'am.

Q: Why didn't you turn and run back to the Tracker?

A: I didn't think of it at the time.

Q: What did you do instead?

A: I went towards the driver.

Q: And why did you do this?

A: This?

Q: Go towards the driver?

A: It was the best plan of attack that way to go in and get ahold of him.

Q: And what are you basing that on when you say it was the best plan of attack?

A: Years of experience, and all the time in a possible ambush situation, I was always trained to go into the ambush, drawing any fire towards that person. It was just instinct, I mean, I pushed the door out of the way and grabbed his hand.

Q: And what was your purpose in grabbing his hand?

A: Pull him out of the car, get him away from the car.

Sergeant Pagotto went on to describe his physical struggle with Preston Barnes and his efforts to bring the car, which was then moving, to a halt:

Q: What did Preston Barnes do?

A: When he ripped his hand up like that (indicating), he leaned over and went down towards the console.

Q: And what were your thoughts at that moment?

A: That he could be going for the gun.

Q: What was the next thing you did?

A: Tried to get out, felt I should disengage.

Q: How did you try to get out?

A: Reached back.

Q: What are you reaching back . . . to?

A: First I went for like the steering wheel, the keys. The keys, I figured if I could get the keys, I can throw them out and this way the car wouldn't go nowhere. I couldn't do that, so I just kept reaching and finally I grabbed onto the door.

Q: Now, how fast is the car moving at this point?

A: A good roll, at this point it is a good roll.

. . .

Q: At what moment did you first see the car begin to move?

A: Actually I felt it first when I was inside the car. I felt the car moving because my feet were still outside the car and I could feel my feet slipping.

Sergeant Pagotto testified that he was pulling himself free of the Subaru at the moment when the Subaru engaged its gears and shot out toward him, at which point his hand hit the side of the car and his gun discharged. He himself was knocked to the streetbed:

Q: Were you ever able to get out of the vehicle?

A: Yes, ma'am.

Q: How did that happen?

A: I reached back and I got ahold of the door, the top of the door frame.

Q: Is that the open door?

A: Yes, ma'am.

Q: The open driver's door?

A: Yes. And I pulled myself back.

Q: And at this moment, what did Preston Barnes do?

A: Started the car and I heard the engine roar and then the tires started spinning and shot out.

Q: And what happened to you as a result?

A: I was thrown down.

Q: Okay. And did anything happen during the time you were thrown down?

A: That is when my hand hit the side of the car, the gun discharged, glass was everywhere, and I fell to the ground.

Sergeant Pagotto described the entire critical confrontation as something that took place within a period of three to five seconds:

Q: What was the amount of time that passed from the moment you saw the driver's door open to the point where the gun discharged?

A: Probably three to five seconds.

Q: Were you hurt at all as a result of the fall?

A: I hurt my hand and I hurt my knee, my left knee.

Q: Did you ever seek any treatment for that?

A: Yes, ma'am.

Q: And where did you seek that treatment?

A: I went to Good Samaritan Hospital that night after I finished at Homicide.

Q: And did you learn what the injuries you sustained were?

A: Abrasion to my hand and abrasion to my knee, and my knee hasn't been the same since, the ligaments.

On cross-examination by the State, Sergeant Pagotto elaborated that just before he pulled himself free from the moving car, he was "reaching for the keys with my left hand, the gun in my right hand, and I'm running sideways." It was then, just as he was freeing himself from the Subaru, that the Subaru suddenly accelerated and drove sideways into him, knocking him to the ground. It was as he was hit and going into his fall that his right hand, holding the gun, hit (or was hit by) the vehicle, causing it to discharge:

Q: And you fall how? Forward?

A: Forward like that (indicating).

Q: And you indicated that your gun hand hit the vehicle and the gun discharged?

A: My gun hand hit the vehicle, the gun discharged, and then the glass exploded and I went down.

Sergeant Pagotto elaborated that it was the back of his right hand, especially his knuckles, that struck (or was struck by) the Subaru at the moment "the gun discharged and then the glass exploded and I went down."

Q: Okay. What part of your hand hit the car? The back of your hand?

A: This area here (indicating).

Q: Okay. Would you show the ladies and gentlemen of the jury the area on your hand you say you hit?

A: This area here (indicating).

Q: The back of the hand, these knuckles; is that correct?

A: Yes.

Q: And how are you holding the gun at that time?

A: I guess like this (indicating).

Q: You guess like that. You're saying your finger was not on the trigger?

A: Correct.

Q: But it wasn't under the trigger guard, was it?

A: No, it wasn't.

Q: And, again, one more time, you hit the back of your hand on the car, is that right?

A: Yes, sir.

### *The Physical Evidence:*

The physical evidence as to the trajectory of the lethal bullet was completely compatible with Sergeant Pagotto's testimony as to how the back of his right hand, holding the gun, hit (or was hit by) the left side of the Subaru just as his weapon discharged. The reason there was a simultaneous

shattering of the glass was that the bullet entered the left rear passenger window of the Subaru through the lower left-hand corner of that closed glass window. The bullet moved in a forward direction from the rear toward the front of the Subaru, passing between the pillar or post that separates the front door from the rear door, on the left, and the driver's bucket seat, on the right. It immediately struck and entered the body of Preston Barnes.

The autopsy revealed the continuing trajectory. Barnes, as he was hit, had obviously turned fully to his left and then slightly to the rear with his left arm upraised. The bullet entered his body just under his left armpit and passed through the anterior part of his chest, piercing the heart and a lung, just before it came to rest toward the right side of his anterior chest. Its passage through the body was at a slightly downward angle.

### The Standard of the Reasonable Police Officer

■ Before turning to a close examination of those actions of Sergeant Pagotto that allegedly constituted gross criminal negligence, it is appropriate to set out the standard against which his conduct is to be measured. It is not that of a reasonable civilian similarly situated but that of a reasonable police officer similarly situated. As Judge Raker explained in *State v. Albrecht*, 336 Md. 475, 501, 649 A.2d 336 (1994), quoting in part from *Albrecht v. State*, 97 Md.App. 630, 642, 632 A.2d 163 (1993):

In determining whether an accused's actions were grossly negligent or criminally reckless, the standard against which a defendant's conduct must be assessed is typically the conduct of an ordinarily prudent citizen similarly situated. As the Court of Special Appeals correctly noted in its opinion, however, where the accused is a police officer, the reasonableness of the conduct must be evaluated not from the perspective of a reasonable civilian but rather from the perspective of a reasonable police officer similarly situated. *Albrecht*, 97 Md.App. at 642, 632 A.2d at 169. As the intermediate appellate court explained:

> Under almost all circumstances, the gratuitous pointing of a deadly weapon at one civilian by another civilian would almost certainly be negligence *per se,* if not gross negligence *per se. A police officer, on the other hand, is authorized and, indeed, frequently obligated to threaten deadly force on a regular basis.* The standard of conduct demanded of a police officer on duty, therefore, is the standard of a reasonable police officer similarly situated.

(Emphasis supplied).

We must look to the testimony of the various experts to establish a standard of required, or recommended, police procedure and then determine whether the evidence generated a jury issue as to whether Sergeant Pagotto's conduct "constituted 'a gross and wanton deviation' from such a standard." *Albrecht v. State,* 97 Md.App. at 643, 632 A.2d 163.

### Common Law Manslaughter and Automobile Manslaughter Involve Precisely the Same Gross Negligence

As we determine whether the State's evidence was sufficient to support the finding of gross criminal negligence, we note that the cases involving manslaughter by automobile, pursuant to what is now Art. 27, § 388, are just as pertinent as are the cases involving common law manslaughter. Chapter 414 of the Acts of 1941 created the crime of manslaughter by automobile. The new crime was made a misdemeanor [9] whereas more generic common law manslaughter remained a felony. Indeed, *Neusbaum v. State,* 156 Md. 149, 143 A. 872 (1928), was an automobile manslaughter case prosecuted as common law involuntary manslaughter thirteen years before the automobile manslaughter law was enacted.

The new statutory misdemeanor completely incorporated the gross negligence standard of the common law felony. *Hughes v. State,* 198 Md. 424, 431, 84 A.2d 419 (1951)("The

---

**9.** Chapters 372 and 373 of the Acts of 1997, however, upgraded the status of manslaughter by automobile, Article 27, § 388, back to the level of a felony.

common law standard of 'gross negligence' as the minimum requirement for conviction of manslaughter where one unintentionally kills in the course of doing a dangerous act is carried over into the recent Maryland statute setting up the separate crime of manslaughter by automobile or other vehicle."); *Thomas v. State,* 206 Md. 49, 51, 109 A.2d 909 (1954)("This statute has been interpreted to have the common law meaning of gross negligence so that, in order to establish guilt, there must be a 'wanton or reckless disregard for human life.' "). *See also Faulcon v. State,* 211 Md. 249, 257, 126 A.2d 858 (1956); *State v. Gibson,* 4 Md.App. 236, 242–43, 242 A.2d 575 (1968); *Boyd v. State,* 22 Md.App. 539, 550, 323 A.2d 684 (1974); *Forbes v. State,* 324 Md. 335, 340–41 n. 2, 597 A.2d 427 (1991).

### What Escalates Negligence Up To Gross Criminal Negligence?

It is universally agreed that a legally sufficient case of ordinary civil negligence is not *ipso facto* a legally sufficient case of gross criminal negligence. As we explained earlier in this opinion, it is not enough to provide a set of legally correct definitions and then simply turn the fact finders loose. In *Duren v. State,* 203 Md. 584, 588, 102 A.2d 277 (1954), the Court of Appeals confirmed that evidence sufficient to support a finding of simple negligence is not of itself sufficient to support a manslaughter verdict:

> In *State of Maryland v. Chapman,* 101 F.Supp. 335, Judge Chesnut in the United States District Court for the District of Maryland, declared that proof of simple negligence will not support a conviction of manslaughter but that there must be proven gross negligence, which must be ". . . such that it amounted to a 'wanton or reckless disregard for human life.' "

The incremental catalyst that may transform mere negligence into gross negligence is, albeit elusive, a substantive element with a unique burden of production that must be satisfied as a matter of law.

■ As we strive to attach a convenient handle to that elusive incremental element, we must, moreover, scrupulously avoid working backward from the consequences. As Chief Judge Robert C. Murphy explained for this Court in *Mills v. State,* 13 Md.App. 196, 200, 282 A.2d 147 (1971), *cert. denied,* 264 Md. 750 (1972):

[W]hether an accused's conduct constituted *gross negligence must be determined by the conduct itself and not by the resultant harm.* Nor can criminal liability be predicated on every careless act merely because its carelessness results in injury to another.

(Citation omitted; emphasis supplied).

The first definition in Maryland of involuntary manslaughter of the gross negligence variety was that provided by *United Life and Accident Ins. Co. v. Prostic,* 169 Md. 535, 539, 182 A. 421 (1936), as it quoted with approval 1 Russell, *Crimes* 636:

There are many *acts so heedless and incautious as necessarily to be deemed unlawful and wanton,* though there may not be any express intent to do mischief, and *the party committing them causing death by such conduct will be guilty of manslaughter.*

(Emphasis supplied).

*Hughes v. State,* 198 Md. 424, 432, 84 A.2d 419 (1951), stated that "the question is whether the conduct of the defendant, considering all the factors of the case, was such that it amounted to a 'wanton or reckless disregard for human life.'" *Duren v. State,* 203 Md. 584, 588, 102 A.2d 277 (1954), concluded that the "gross negligence" that must be proven to support a manslaughter conviction "amounted to a wanton or reckless disregard for human life." That definition was repeated verbatim in case after case. *Allison v. State,* 203 Md. 1, 5, 98 A.2d 273 (1953); *Clay v. State,* 211 Md. 577, 584, 128 A.2d 634 (1957); *Lilly v. State,* 212 Md. 436, 442, 129 A.2d 839 (1957); *Johnson v. State,* 213 Md. 527, 531, 132 A.2d 853 (1957); *Abe v. State,* 230 Md. 439, 440, 187 A.2d 467 (1963); *Wasileski v. State,* 241 Md. 323, 324, 216 A.2d 551 (1966); *State v. Kramer,* 318 Md. 576, 590, 569 A.2d 674 (1990); *Dishman v. State,* 352

Md. 279, 291, 721 A.2d 699 (1998); *Montague v. State*, 3 Md.App. 66, 69–71, 237 A.2d 816 (1968); *Boyd v. State*, 22 Md.App. 539, 550, 323 A.2d 684 (1974); *Cummings v. State*, 27 Md.App. 361, 389, 341 A.2d 294 (1975); *Blackwell v. State*, 34 Md.App. 547, 556–57, 369 A.2d 153 (1977); *Taylor v. State*, 83 Md.App. 399, 402–04, 574 A.2d 928 (1990); *Forbes v. State*, 324 Md. 335, 340–41 n. 2, 597 A.2d 427 (1991); *Pineta v. State*, 98 Md.App. 614, 622, 634 A.2d 982 (1993); *Plummer v. State*, 118 Md.App. 244, 252, 702 A.2d 453 (1997).

*Craig v. State*, 220 Md. 590, 155 A.2d 684 (1959), was a case involving common law manslaughter rather than automobile manslaughter. The Court of Appeals did not hesitate to adopt the same definition of gross negligence and readily looked to the automobile manslaughter cases for precedential guidance. The Court stated, 220 Md. at 597, 155 A.2d 684:

> [T]o establish civil liability, the rule, generally, is a failure to use that degree of care and caution that an ordinarily careful and prudent person would exercise under like circumstances. But, in Maryland, if the basis of the charge be felonious negligence as it is in the instant case, it must have been gross or criminal negligence, which has been interpreted by this Court to mean "a wanton or reckless disregard for human life."

(Citation omitted).

*Palmer v. State*, 223 Md. 341, 164 A.2d 467 (1960), was also a case involving common law manslaughter rather than automobile manslaughter. Again, the Court of Appeals applied the same definition of gross negligence, stating at 223 Md. at 351–52, 164 A.2d 467:

> We think that the appellant's conduct and actions, in permitting and, in fact, compelling this poor little defenseless urchin to remain in an environment where she was subjected to merciless, inhumane and inordinate brutality of a protracted nature, manifested a recklessness of justice and the rights and feelings of the tiny infant in such a manner so as to support the finding that the appellant's conduct and actions displayed "a wanton or reckless disregard for human

life." The actions of McCue were so outrageous as to put any reasonable person on guard that the child's life was in real and imminent peril.

*Mills v. State,* 13 Md.App. 196, 282 A.2d 147 (1971), was a case involving common law involuntary manslaughter. Chief Judge Murphy utilized the standard definition of gross criminal negligence:

> [W]here a charge of involuntary manslaughter is predicated on negligently doing some act lawful in itself, the negligence necessary to support a conviction must be gross or criminal, *viz.,* such as manifests a wanton or reckless disregard of human life.

13 Md.App. at 200, 282 A.2d 147.

In *Duley v. State,* 56 Md.App. 275, 467 A.2d 776 (1983), a father was convicted of both child abuse and the involuntary manslaughter of his daughter. In affirming the conviction for common law manslaughter, Chief Judge Gilbert stated, 56 Md.App. at 289, 467 A.2d 776:

> Involuntary manslaughter may consist of the doing of a lawful act in a grossly negligent manner. The evidence shows that Duley exercised a reckless disregard for human life and thus sustains the manslaughter conviction.

(Citations omitted).

In *State v. Albrecht,* 336 Md. 475, 499–500, 649 A.2d 336 (1994), Judge Raker synthesized all of the pre-existing language on the quality of gross negligence into the most complete statement our case law has yet produced as to that incremental quality necessary to transform civil negligence into criminal negligence:

> It has long been stated that where the charge of involuntary manslaughter is predicated upon the allegation that the defendant committed a lawful act in a negligent manner, a conviction of manslaughter will not lie on a showing of simple negligence or misadventure or carelessness but must rather be predicated upon that degree of aggravated negligence which is termed "gross" negligence.

. . .

In determining whether a defendant's actions constituted gross negligence, we must ask whether the accused's conduct, "under the circumstances, amounted to a disregard of the consequences which might ensue and indifference to the rights of others, and so was a wanton and reckless disregard for human life." Stated otherwise, the accused must have committed "acts so heedless and incautious as necessarily to be deemed unlawful and wanton," manifesting such a gross departure from what would be the conduct of an ordinarily careful and prudent person under the same circumstances so as to furnish evidence of an indifference to consequences. It is only conduct which rises to this degree of gross negligence upon which a conviction of involuntary manslaughter can be predicated.

(Citations omitted).

### The Accidental Firing of the Weapon

The State's theory of the case is of necessity predicated on an assumption that Sergeant Pagotto's service weapon discharged accidentally, thereby killing Preston Barnes. At the end of the State's case, Sergeant Pagotto's Motion for a Judgment of Acquittal was granted with respect to any theory of voluntary manslaughter. The trial judge agreed that there was no evidence to support a conclusion that Sergeant Pagotto had intentionally killed Preston Barnes and that any possible manslaughter had, therefore, to be of the involuntary variety. After brief argument on the possible theory of voluntary manslaughter, the ruling of the court was as follows:

The Court: [T]he obvious logic of this is that the voluntary manslaughter would not be put to the jury [; that] essentially is what it comes down to.

. . .

Mr. Belsky: Your Honor, I'm asking for judgment on acquittal on voluntary manslaughter. I don't want the case to go back to the jury [on the theory] that there

[might] be voluntary manslaughter or involuntary manslaughter.

The Court: No, I think we just said that it would go back only on involuntary.

Thus, the case went to the jury entirely on the theory of involuntary manslaughter of the gross negligence variety. The alleged gross negligence essentially consisted of three violations of Baltimore City Police Department guidelines, that enhanced the likelihood that the service weapon might discharge accidentally. Although the prosecution insisted that a finding that Sergeant Pagotto had no intention to kill Preston Barnes did not necessarily compel a conclusion that Sergeant Pagotto had not intentionally discharged his weapon, the entire presentation of the case belied that lesser intentional act. Indeed, had the State itself believed that Sergeant Pagotto had intentionally fired his weapon, Sergeant Pagotto would have also been charged with murder rather than just with manslaughter. It would be hard even to concoct a manslaughter theory on these facts based on the intentional firing of the weapon.

Had the appellant intentionally fired the weapon with the intent to kill Preston Barnes, the State's theory of the case would have been murder of the specific-intent-to-kill variety. Had the appellant intentionally fired the weapon with the intent only to injure or to incapacitate Preston Barnes, the State's theory would have been murder of the specific-intent-to-inflict-grievous-bodily-harm variety. Had the appellant intentionally fired the weapon with the intent to intimidate or to frighten the occupants of the Subaru into compliance, the State's theory would have been murder of the depraved-heart variety.

The State, instead, presented a parade of expert witnesses to testify to the alleged violations of Baltimore City Police Department guidelines. The express purpose in calling those experts was to show that Sergeant Pagotto's negligence had significantly increased the likelihood that his weapon might go off accidentally. Had the State's case been predicated on the

theory that Sergeant Pagotto fired intentionally, the testimony of the experts would have been utterly irrelevant. The deliberate pulling of the trigger would not in any way have been dependent upon whether the trigger finger had a moment earlier been slightly closer or slightly further away from the trigger itself.

The legal sufficiency of the State's evidence, therefore, must be focused exclusively on the proposition that the weapon discharged accidentally because of the grossly negligent way in which Sergeant Pagotto was handling it at the moment of discharge.

### The Alleged Acts of Gross Criminal Negligence

To prove its case of gross criminal negligence against Sergeant Pagotto, the State called four expert witnesses. They were 1) Major Francis Melcavage, a former instructor at the Baltimore City Police Training Academy; 2) Sergeant Craig Meier, an instructor with the Firearms Training Unit of the Education and Training Division of the Baltimore City Police Department; 3) Sergeant Timothy Vittetoe, a former instructor at the Maryland State Police Academy; and 4) John L. Meiklejohn, a retired Captain of the Montgomery County Police Department, who had been involved for years in training members of that department.

The defense also called three expert witnesses, including former Baltimore City Police Lieutenant Charles J. Key, a former instructor at the Baltimore City Police Academy and the author of the guidelines allegedly violated by Sergeant Pagotto. Although Lieutenant Key had been interviewed by the State initially, the State declined to call him as its witness. The two other experts called by the defense were 1) Gary McElhenny, a seventeen-year veteran of the Baltimore City Police Department who had spent eight years working in narcotics; and 2) Sergeant Willis Patrick O'Toole, assigned to the Training Division of the Anne Arundel County Police Department and specializing in the subjects of (a) use of force, (b) officer survival, and (c) firearms.

The State's case with respect to gross negligence consisted of what were essentially three alleged violations of Baltimore City Police guidelines. The State's theory was that each of the three violations negligently increased the risk that Sergeant Pagotto's trigger finger might slip from a position where it was not on the trigger into a position on the trigger so that, in the final struggle between Sergeant Pagotto and Preston Barnes, Sergeant Pagotto's finger ended up in a position where the weapon could accidentally be discharged.

### A. *The Placement of Sergeant Pagotto's Trigger Finger:*

The first of the alleged guideline violations concerned the placement by Sergeant Pagotto of his trigger finger on his weapon. On the day of the shooting in this case, February 7, 1996, the police department guideline for an officer approaching a suspect with a drawn and loaded weapon was that the officer should have his trigger finger not only outside the trigger guard but literally underneath the trigger guard. The evidence indicated that Sergeant Pagotto properly had his finger off the trigger and outside the trigger guard but improperly, in undisputed contravention of the guideline, along the "slide" of the automatic weapon rather than underneath the trigger guard. The slide of a Glock automatic is the side of the weapon encasing the barrel. It is above and might well be forward of the trigger guard area, so that a clutching motion could readily result in the trigger finger's entering the trigger guard area and coming into contact with the trigger itself.

Major Melcavage testified that he was the training officer at the Baltimore City Police Academy who personally taught Sergeant Pagotto in the subject of defense tactics when the Sergeant first went through the Academy in 1980. Major Melcavage further explained that in 1980 the service weapons issued to Baltimore City officers were revolvers rather than automatics and that there was, at that time, no training with respect to automatics and where an officer should place his trigger finger:

Q: When he was provided that training, where was the training of where to put your finger:

A: That question was not addressed in training either when he went through the academy.

Q: But what was the general guideline when he got his training?

. . .

A: It wasn't addressed. I don't know that there was one.

Nothing that Sergeant Pagotto did on February 7, 1996 contravened any training he had received at the Baltimore City Police Training Academy.

Periodically, however, the guidelines change. For officers who have already gone through the Academy, there is also periodic, albeit minimal, retraining. A guideline was promulgated for the first time with respect to the placement of the trigger finger in 1990, when the police department changed its standard weapon from the revolver to the Glock automatic. The new guideline as of 1990, however, actually authorized the placement of the trigger finger along the "slide." Major Melcavage testified:

Q: ... And where was the training to put your finger, when running and handling a gun and you didn't want to fire it, before they were put under the trigger guard?

A: It was to be outside the trigger guard along the slide like this.

Nothing that Sergeant Pagotto did on February 7, 1996, contravened the guideline promulgated in 1990.

At some time in 1993 or 1994, a newer guideline was promulgated. It was the result of several accidents that had happened at the Baltimore City Police Training Academy. The new guideline was written for the police department by Lieutenant Charles J. Key. It directed that the trigger finger be underneath the trigger guard and not along the "slide" of the weapon.

Significantly, Captain Meiklejohn testified that Montgomery County officers, unlike their counterparts in Baltimore City, are still trained to keep the trigger finger on the "slide" of the weapon:

Q: ... [Y]ou generally keep your finger on the slide or on the trigger guard?

A: Yes, sir.

Q: And that's different than Baltimore City. Baltimore City trains its police officers to keep its fingers underneath of the guard?

A: Yes, sir.

He explained that having the trigger finger below the trigger guard unduly slows down the officer's reaction time:

Q: Okay. Now, putting one's finger on the slide or trigger guard for your department deals with the concept that you don't want the finger on the trigger so you can avoid an accidental shooting, correct?

A: Yes, sir.

Q: And the reason you don't put it below the trigger guard as Baltimore City does is that it interferes with the reaction time of the police officer. It takes a little longer to raise it to put it in the trigger?

A: That's possible depending upon the individual, but like you had stated, it's up to each individual agency.

Sergeant Meier also testified for the State as to the guideline with respect to the placement of the trigger finger:

But the finger has to be off the trigger and below the trigger guard until it's perceived that he's actually going to have to use the weapon to defend himself.

. . .

Q: Just to follow up on that. Below the trigger guard, isn't it a fact that your department is the only department that has that policy?

A: Yes.

Q: That every other department in the state has either the slide or on top of the trigger guard itself?

A: That's my understanding.

Q: And that's a fairly recent policy, is it not?

A: That was created by your expert [to wit, former Lieutenant Charles J. Key, who wrote the new guideline] in 1993.

The questioning on that subject went on:

Q: The State Police do not teach the method that Joe Key created; is that correct?

A: As far as I know, no.

Q: And Baltimore County does not teach that method, does it? They teach the method that you used to teach up until two and half years ago?

A: Three years ago now.

Sergeant Vittetoe of the Maryland State Police also testified as to finger placement:

Q: And isn't it true that the Maryland State Police Department trains their officers to also keep their finger in a ready position along the slide of the gun as opposed to under the trigger guard, correct?

A: That is correct, ma'am.

Q: And it's after they move from that position on the slide that they can then put it down on the trigger ready to shoot while they are covering the suspect that they are covering?

A: Yes, ma'am.

Former Lieutenant Key was the author of the new Baltimore City guideline with respect to the placement of the trigger finger under the trigger guard. He explained the reasoning behind the new standard:

But the finger, as I wrote the guideline, I think about 1994, it changed over in the lesson plan, is put the finger here, not under here as you've seen and there are reasons for that, that you couldn't [accidentally] shoot the weapon. But I

wanted the finger up here because it would take a positive movement to move it in the trigger guard. And there is a clutching reaction that occurs with firearms.

Lieutenant Key further pointed out that Baltimore City is the only police agency in the state that has such a guideline:

Q: Now, regarding where his finger was on the gun, can you explain—first of all, is your guideline the only guideline in the state that has that, that specific guideline at, at the point you showed it [to] the jury?

A: The finger underneath or forward of the trigger guard and just underneath?

Q: Right.

A: We are the only agency in the state that has that as a guideline, yes, sir.

When asked why he thought Sergeant Pagotto had his finger on the "slide" on the evening of February 7, 1996, Lieutenant Key explained that "in 13 years, there's a factor in skills training. It's called muscle memory." He explained "muscle memory":

Your body trains itself to do certain things. That applies in this situation because it over the years, and in this case 13 years, your finger is alongside the slide, you cannot eradicate this muscle memory in ... 20 or 30 minutes worth of training. It just won't happen. He's going to go back and do what he did in a stress situation, what he's trained himself to do most frequently.

Q: And in every other department in the State of Maryland, what he did, assuming he had it on the slide, would have been the appropriate standard?

A: Yes, sir.

■ We hold that Sergeant Pagotto's placement of his trigger finger along the "slide" of his Glock automatic, whether considered alone or in combination with any other factor, does not remotely generate a *prima facie* case of gross criminal negligence. We are not substituting our weighing of the evidence for that of the jury. We are holding, as a matter

of law, that the burden of production as to gross criminal negligence was not satisfied so as even to permit the jury to consider such a charge. Although Sergeant Pagotto may not have followed a recently imposed and geographically unique guideline, his action in that regard was not inherently wrong or of a *malum-in-se* character.

Had a Maryland State Trooper or a Baltimore County Officer, for instance, ridden along with Sergeant Pagotto on February 7, 1996, and engaged in precisely the same conduct that Sergeant Pagotto did, that State Trooper or County Officer would have been acting with complete propriety with respect to the placement of the trigger finger on a weapon. Had Sergeant Pagotto himself placed his trigger finger on the "slide" of his weapon on February 7, 1993, instead of on February 7, 1996, he would then have been acting with complete propriety. Except for a criminal violation of a local municipal or county ordinance, precisely the same act under precisely the same circumstances cannot be a crime in Baltimore City but not a crime in Baltimore County.

Under the circumstances, no trier of fact could reasonably read into the appellant's act of placing his trigger finger where he did any notion of a wanton and reckless disregard of human life or of some gross and outrageous deviation from what reasonable police officers do and are expected to do. If that behavior was negligent, why are we authorizing police officers all over the state to engage with impunity in such negligent conduct? This hypertechnical violation of a departmental guideline clearly does not establish a *prima facie* case of gross negligence.

### B. *The Closing on the Target With Weapon in Hand:*

The second alleged violation of a Baltimore City Police Department guideline by Sergeant Pagotto was that he "closed" on the white Subaru with his gun drawn. Although there was no clear consensus among the State's experts as to precisely what the forbidden "closing" radius was, it was universally agreed that "closing" is a much more restrictive

term than "approaching." From the moment that Sergeant Pagotto alighted from the police vehicle and started walking toward the stopped Subaru, several car lengths ahead, he was approaching the Subaru but he was not yet "closing."

During that approach, Sergeant Pagotto withdrew his weapon from its holster and held it in his right hand. None of the experts questioned the propriety of that action. Sergeant Meier was clear on that point:

> Q: If as he approached that vehicle, when he was ten feet away from the vehicle he felt a threat to himself, number one, *I assume you have no problem with him withdrawing his weapon?*
>
> A: *No, he's perfectly justified in doing that.*

(Emphasis supplied).

Lieutenant Meiklejohn agreed, making reference to Montgomery County practice in that regard:

> A: It's under a note. "Display of firearms. Firearms may be drawn whenever officers have reason to fear for their safety or the safety of others. Once again, drawing your weapon is *not* predicated on the type of offense, it's the threat you perceive. There are no guidelines that specifically outline when you draw your weapon, it is up to you to make that decision."
>
> Q: So the drawing of a weapon—I'm sorry—this policy is a pretty universal policy, is that correct?
>
> A: I would say yes.
>
> Q: So the drawing of a weapon does not mean that you need probable cause that a felony or a misdemeanor had been committed. It simply means that it is the police officer's perception that his life is in danger?
>
> A: That's correct.

(Emphasis in original). He then made a more specific assessment of Sergeant Pagotto's action:

[I]n Officer Pagotto's situation, *I don't think there's anything wrong with him drawing his weapon when he draws it.*

(Emphasis supplied).

Lieutenant Key was also of the opinion that Sergeant Pagotto had acted reasonably in drawing his weapon:

A: Yes, sir, *the unholstering the weapon was reasonable.*

. . .

Q: Would you cover the basis for that opinion?

A: The basis for that opinion is the time of night; the type of, the type of crime that occurs in this area; Sgt. Pagotto's perception that the driver in this ear to shoulder movement was reaching for a weapon; the potential for the persons in that car to be involved in other crimes, a stolen car or the drugs. All of that is— it would be reasonable and consistent with his training in order to draw his weapon.

Q: *But he didn't see a weapon.* Would that, *would that factor into it?*

A: *Absolutely does not factor into it.* The, the instruction to officers in drawing their, their weapon is that if they have a reasonable belief that theirs or someone else's life is in danger. *If we had an instruction that said you may not draw a weapon unless you see a weapon, then you're going to get a lot of police officers shot or killed because they cannot react quickly enough* to a threat to be able to draw, to be able *to draw their weapon after they have already seen the weapon. By then, it's too late.*

(Emphasis supplied).

Major Melcavage placed the encounter in perspective when he explained that the automobile stop (along with responding to a domestic violence call) is one of the two most dangerous situations in which police officers find themselves:

The Witness: It is a situation that a police officer has very little control over right from the beginning. You don't have full view of the subject that you are approaching, you don't know if weapons are in the vehicle, you don't know if the person in the vehicle is hiding something. It was an action that was initiated by the officer. All of those factors make it a dangerous situation.

The distance from the target at which approaching becomes "closing" was variously given as somewhere between six and ten feet. Whatever the distance, the generating principle is that an officer should not, with a drawn weapon, get so close to a suspect that the suspect might be able suddenly to wrench the weapon from the exclusive control of the officer.

For purposes of assessing the special *mens rea* of involuntary manslaughter, it must be noted that this particular guideline, as part of the larger subject known as **DEFENSE TACTICS,** is quintessentially designed for the protection of the officer himself. While it is true a struggle over a weapon could also incidentally lead to the inadvertent injury of the suspect or an innocent third person, the self-preservation of the officer is the energizing *raison d'etre* behind this particular tactic and, indeed, behind the whole course in defense tactics. As the State's experts repeatedly emphasized, an officer who in the course of his duties overrides this guideline is risking his own life.

Although Sergeant Vittetoe characterized Sergeant Pagotto as "reckless" in drawing his weapon in the first instance, his concern was that Sergeant Pagotto was thereby being reckless primarily about his own safety and secondarily about that of his fellow officer and of "any citizens . . . not related to that incident." He did not include a non-compliant or aggressive suspect within the protective compass of the policy or guideline:

[S]ometime during [his] exiting his vehicle and approaching the suspect's vehicle, or Preston Barnes' vehicle, he had taken his gun out. To me that is reckless because if this is not a routine or unknown risk traffic stop, Sergeant Pagotto

should have never left his vehicle or the area surrounding his vehicle. *The reason I say that, he does that for his protection, for Sergeant Pagotto's protection.* he uses that vehicle as kind of a barrier between him and the vehicle in which he is dealing with.

. . .

*His responsibility* at that point in time *should have been for his protection, the protection of his fellow police officer, Sergeant Wagner, and any citizens or civilians not related to this incident,* period.

(Emphasis supplied).

Sergeant Meier placed the critical distance at ten feet but also described the danger of moving closer as a danger to the officer himself:

A: We teach closing as coming into an area where you are limiting your reaction time. We teach keep a distance of at least ten feet from a suspect when you have your weapon in your hand. *Anything closer puts you in jeopardy. It cuts your reaction time down.*

(Emphasis supplied).

Major Melcavage estimated the critical radius to be no more than five or six feet. He also testified, however, that although "closing" within that radius might be tactically "inadvisable," it would not constitute a violation of any policy or guideline:

Q: [H]ow close do you get when it is considered closing?

A: I have never considered that question before. Certainly *you would need enough distance so that if someone were to pull a weapon, you would be able to react,* gain cover if you needed to, five or six feet.

Q: Five or six feet?

A: Uh-huh.

Q: So it would be in your mind a violation of a policy or guideline to come within five or six feet of a subject with your gun drawn if you suspected they had a weapon?

A: I don't think that policy has even been delineated. *I wouldn't say it was a violation of policy, I would say it was probably inadvisable action.*

Q: *Well, but there is a policy that you are familiar with that you should not close with your weapon in your hand, right? Isn't that what you are saying?*

A: *No, not that I am aware of.*

Q: All right. *So you can close with a weapon in your hand?*

A: *Yes.*

Q: And closing would be coming up and putting the person under arrest?

A: That is correct.

(Emphasis supplied).

Lieutenant Key, the author of the "closing" guideline, did not believe that Sergeant Pagotto was acting unreasonably when he violated it:

Q: Okay. Do you, do you have an opinion as to whether or not Stephen Pagotto on February the 7th, 1996, was reasonable despite the fact the guidelines were violated?

A: As far as to the closing?

Q: As far as the closing is concerned.

A: Yes, sir.

He explained the reasoning behind his conclusion:

Q: Okay. Give us the basis of your opinion that the closing in this case was reasonable.

A: Well, *it's a guideline. Guidelines are discretionary to some degree.* The officer has a reasonable perception that his life was in danger. Every circumstance or every situation is evaluated differently. *He did not abide by the guideline, but in this circumstance* the immediacy of the situation from the perception of a reasonable officer, which is the standard that I used to

evaluate the—a police-involved shooting, *was reasonable.*

Q: *So, you're saying he, he did what a reasonable police officer would do under the same or similar circumstances?*

A: *Yes, sir.*

(Emphasis supplied).

Lieutenant Key raised the additional issue that the entire guideline about "closing" actually applies to a distinct situation—when the officer is holding an arrestee or a stoppee at bay—and does not really pertain to the situation in which Sergeant Pagotto found himself on February 7, 1996:

Q: He received your training?

A: Yes, sir.

Q: In conformance with these guidelines?

A: I trained the officers in conformance with the guidelines, that's correct.

Q: And you trained them not to close with a gun in their hand within 10 feet?

A: Well, *actually, that section*—the section *applies to a situation where they're holding someone at bay.* That is one of the sections and one of the things in there. *It's confronting an individual. It really is not the case at hand.*

(Emphasis supplied).

It bears noting, moreover, that the specific danger this guideline is designed to guard against never came to pass. Preston Barnes never grabbed Sergeant Pagotto's weapon nor wrestled with the Sergeant for the control of it. What Barnes did, rather, was to drive the automobile he was controlling into Sergeant Pagotto's body and particularly into the arm that was holding the weapon. In the last analysis, Barnes "closed" on the gun rather than *vice versa.* The harm that the guideline was designed to prevent never occurred.

Even assuming that "closing" to within a few feet of Preston Barnes constituted ordinary civil negligence, there was nothing in the appellant's behavior to suggest "a wanton and reckless disregard for human life." He approached an inherently dangerous confrontation with his weapon in hand.

█ Hindsight, indeed, revealed that Sergeant Pagotto's suspicions and fears were well-grounded. Although Sergeant Pagotto did not know it at the time, Preston Barnes was almost certainly committing a felony in his presence—the possession of cocaine with the intent to distribute. Rather than risk a violation of probation, Preston Barnes was poised, just as the Sergeant drew near, to initiate a high-speed getaway, wantonly running down Sergeant Pagotto in the process if need be. If in a stress-laden situation and for his own self-protection Sergeant Pagotto violated a departmental guideline, he did not thereby commit an act of gross negligence.

### C. *The So–Called Vehicular Extrication:*

The State's third alleged violation of a Baltimore City Police Department guideline is its theory that Sergeant Pagotto, as some sort of "Rambo" or one-man army, deliberately kept his gun in his right hand and, with his left hand alone, initiated the opening of the door of the Subaru and then attempted a one-armed "vehicular extrication," to wit, a dragging of Preston Barnes out of the automobile. The assistant state's attorney characterized the defendant as a self-styled Superman.

The only witness to any direct physical contact between Sergeant Pagotto and Preston Barnes, however, was Sergeant Pagotto himself. Neither Damien Jackson nor Ali Austin testified to any touching, let alone struggling, between Pagotto and Barnes. Sergeant Pagotto's version of the struggle is neither the best State's version nor the best defendant's version of the evidence. It is the only version we have. He described how, just as he "got to about the back door on the driver's side," the front door suddenly "sprung open." His only thought was that he "was going to be shot." His

instinctive reaction was to go "towards the driver." He testified that "[i]t was the best plan of attack ... to go in and get ahold of him" and that "[y]ears of experience, and all the time in a possible ambush situation, I was always trained to go into the ambush."

Sergeant Pagotto testified that it is particularly dangerous for an officer to be facing a partially open car door. That configuration gives the person on the inside both concealment and the advantage of a narrow gun port or avenue of fire while affording the person on the outside a minimal window of opportunity through which to take effective countermeasures. In such a situation, the officer has to get the door either closed or opened wider. As a purely defensive reaction, Sergeant Pagotto opted to pull the door further open and then to grab for Barnes's arm. That widening of the already opened breach may have been the action observed by Jackson and Austin although they did not see Sergeant Pagotto reach in.

The expert assessment of the appellant's testimony about that final encounter was minimal. Major Melcavage explained the training that is given with respect to vehicular extrication in the abstract. He testified that he did not "teach firearms" and that his course on defense tactics was concerned with "mostly unarmed techniques." He pointed out that "the subjects that I basically taught, the defense tactics program, ... was all hand to hand." It was in that context that he testified:

Q: As part of the defense tactics, were there any control tactics as part of your teaching that would involve the use of a single hand or one hand?

A: No, sir, *all the techniques I taught required two hands.*

Q: And why was that?

A: You can't effectively gain control of an individual with just one hand.

(Emphasis supplied). Major Melcavage elaborated:

Q: And the weapon is not supposed to be part of that equation?

A: No, sir.

Q: If you have a gun in your hand, and you intend to remove a driver from a vehicle through the use of a control tactic, what should you do with that weapon?

A: You would have to holster the weapon.

Q: And why is that?

A: Because you need two hands to gain control of an individual or to apply a technique as taught at the academy as I taught.

Major Melcavage further acknowledged that in the twenty-week programs given to police recruits, such as the one Sergeant Pagotto took in 1980, a single three-hour class is spent on vehicular extrication and then, in subsequent retraining programs, the subject is "never touched upon again."

Sergeant Vittetoe was critical of Sergeant Pagotto for attempting to control Barnes "with one hand and with a gun in the other." He elaborated:

And this is for a reason. *First of all, it's difficult to control somebody with one hand.* You don't know of their physical size, strength, abilities, or anything else, and it generally requires two hands. Also, for the protection of the firearm, the firearm, once you take it out and you are dealing with a suspect, a driver, in this case Preston Barnes, *you don't want to present that gun to that person because that weapon can now be used against you.*

(Emphasis supplied).

Sergeant Vittetoe acknowledged, however, that the Maryland State Police had permitted State Troopers to grab persons they were attempting to arrest with one hand even while holding a gun, ready to shoot, in the other hand until approximately 1994.

The testimony of both Major Melcavage and Sergeant Vittetoe dealt with the subject of vehicular extrication as an abstract academic or training exercise. Self-evidently, one can wrestle with an opponent more effectively with two hands than with one. That's the school solution. They analyzed the

problem as if Sergeant Pagotto had moved forward *ab initio* with a pre-formed and deliberate plan to perform a one-armed vehicular extrication. Their opinions had no pertinence to an instinctive, split-second reaction, actual or hypothetical, where the right hand is already holding a weapon and where a car door suddenly opens, a foot or two away, in front of one's face. The instantaneous reaction either to "move into the ambush" or to attempt to retreat to the cover of the police cruiser is something that is not concerned with the schoolroom paradigm of a model vehicular extrication.

Lieutenant Key placed Sergeant Pagotto's instinctive reaction, when suddenly faced with a partially opened car door and the fear of being shot, in a less abstract perspective:

Q: Well, do you have an opinion as to Steve Pagotto reholstering his weapon as he got closer?

A: Yes, sir.

Q: And what is that opinion? Could he have done that? Should he have done that? Explain, explain it to the ladies and gentlemen of the jury.

A: *His not reholstering—it's not a question should he or could he, it's a question of whether it's reasonable. His not reholstering in this instance was reasonable.*

Q: *And why is that?*

A: There are two reasons. One, *the immediacy or the potential of the person being armed inside the car. That's first and foremost because it's his life that he's trying to protect.*

(Emphasis supplied).

 The appellant's version of this part of the encounter does not permit a finding that the Baltimore City Police Department guideline as to vehicular extrication had been violated. Even assuming, *arguendo*, that there had been a violation, however, that would be, at most, a *prima facie* case of ordinary civil negligence. Assuming that this is a case in which an officer might be civilly liable for negligence, there was insufficient evidence of the type of wanton and abandoned

indifference to human life required to meet the incremental burden of production that must be satisfied before a jury can consider the issue of gross criminal negligence.

## D. *The Unfeasability of a Mass Police Response:*

A sub-theme running through the testimony of several of the State's experts was that even if Sergeant Pagotto could not be faulted for his conduct once he was involved in a close one-on-one confrontation, he was at fault for allowing the one-on-one confrontation to develop in the first instance. The expert opinion was that once Sergeant Pagotto had some reason to believe that the white Subaru might be stolen or some reason to believe that the occupants of the white Subaru might be armed, he should have been more circumspect than he was.

Several of the experts testified that he should have remained behind the door of his police cruiser, using it as a shield, while he radioed his dispatcher and requested additional backup units. There was even the suggestion that he could have requested one of the two police helicopters in case the white Subaru attempted a getaway.[10] The State was not entitled as a matter of law to rely upon the suggestion that Sergeant Pagotto should have summoned the police reinforcements necessary to treat the stop in this case as a "felony stop."

It was Lieutenant Key who placed in perspective just what a felony stop would entail and why the stop in this case could not possibly be justified as a felony stop:

> [I]t was a traffic violation. The reasonable suspicion that there are other activities will not, in itself, justify a felony car stop. There is no probable cause to believe that a felony was being committed. . . .

---

**10.** The testimony revealed that in Baltimore City, unlike most other Maryland jurisdictions, the police are not permitted, except in cases of certain dangerous felonies, to engage in a vehicular chase of fleeing suspects.

In a felony car stop, if you go through the procedures, you get people out, you put them on the ground, you put their hands on their head, they're laying out in the street. You have to have traffic stops. You have to have more than one car. *It's actually two cars, and sometimes three cars, involved in it.* You go through this whole process, bring them back, frisk them one at a time. The process takes 35 or 40 minutes. We have thousands of cars recovered—stolen cars recovered in the City of Baltimore every year. Overwhelmingly, the majority of them are unauthorized use. That's what they're charged with in the end.

Q: Is that a felony or misdemeanor?

A: That's a misdemeanor.

Q: Go ahead.

A: And *if we had a felony car stop every time the cop believed that somebody was inside that might be armed* or a threat to his safety, *we don't have enough police to be able to conduct felony car stops.* This is a violent, urban community in places in the City of Baltimore and the cops have to deal with it like that. It's not like being on the roads in the State of Maryland.

(Emphasis supplied).

The recommended response testified to by the State's experts ignored the fact that the city-wide gun recovery program had gun recovery units operating throughout the city on a daily and nightly basis. Every stop of an automobile by a gun recovery unit necessarily involved a suspicion by the officers that the occupants of the automobile might well be armed. The occupants of the automobile fit the profile of those who were more likely than others to be in possession of guns or they would never have been stopped in the first place.

The gun recovery effort relied upon, as a key technique, pretextual stops for traffic violations in order 1) sometimes to frisk the occupants, 2) sometimes to spot guns or other evidence of crime in plain view, or 3) sometimes to engage in consensual searches of the automobile and/or its occupants, all as ways of discovering and recovering guns. Whatever the

real motivation, however, the only constitutional justification remained a traffic violation.

Without benefit of hindsight, the stop of the white Subaru in this case would have appeared to be no different than the stop of any other automobile by any other gun recovery unit. Many such stops will, by the very nature of things, yield no guns. If in this case, for example, Sergeant Pagotto and Officer Wagner had remained beside their police cruiser holding the occupants of the white Subaru at bay, other police cars had sped to the scene with sirens wailing and dome lights flashing, a helicopter perhaps had hovered overhead, the occupants of the Subaru had been handled as potentially armed and dangerous individuals, and all that had ultimately eventuated was the issuance of a traffic citation for displaying a license tag in the wrong place, the angry community reaction can readily be imagined. If such a scenario were repeated a half-dozen times, outraged demonstrators would besiege City Hall and law suits and requests for injunctions would fill the emotionally charged atmosphere. What the experts in this case suggested, with the benefit of hindsight, was simply not realistic for gun recovery units relying on pretextual traffic stops.

If anything on the night of February 7, 1996 was fraught with the danger of ill consequences, it was perhaps the governmental policy itself of relying on pretextual traffic stops for the purpose of taking guns off the street, a policy of confronting a grave on-the-street reality with a relatively feeble rationale. Such a policy, of course, was something decided on at a level far above Sergeant Pagotto's in the governmental chain of command.

Another obvious flaw in this suggestion is the fact that the Baltimore City Police Department simply does not have the resources to respond massively to every potentially dangerous stop by a gun recovery unit. What the experts suggest that Sergeant Pagotto should have done was simply not a viable alternative. *A fortiori*, his disinclination to pursue a non-viable alternative was, as a matter of law, not

evidence of a felonious *mens rea* and the charge of manslaughter should not, therefore, have gone to the jury.

### E. *The Legal Significance of Not Following a Guideline:*

All of the testimony of all of the experts, save one, made no mention of a key link in the chain of logic that was an indispensable but unspoken part of the State's case. Even granting, *arguendo,* the failure of an officer to follow a departmental guideline, what is the significance of such a failure? The missing premise was vital to the validity of the State's ultimate syllogism of guilt.

The only witness to testify with respect to the significance of the Baltimore City Police Department guidelines was former Lieutenant Charles J. Key. He was called, to be sure, as a defense witness and his testimony, therefore, does not literally qualify as part of that version of the evidence most favorable to the State's case. In any meaningful discussion of the legal sufficiency of the evidence in this case, however, his testimony—in strictly legal terms and not in any terms of competing credibilities or the weighing of evidence—cannot be ignored. He was the author of the critical guidelines in issue and the only expert witness to testify with respect to their significance.

Lieutenant Key is a twenty-six-year veteran of the Baltimore City Police Department, having served as a supervisor for twenty-one of those twenty-six years. On the subject of the use of firearms, he had received certification from Northwestern University. He has been a consultant on the subject to both the Baltimore City Police Department and various outside agencies. He had taught the use of force to thousands of police officers and to over a thousand prosecuting attorneys—United States Attorneys, State Assistant Attorneys General, and local State's Attorneys and District Attorneys. He had done over five hundred evaluations of officer conduct in police-involved shootings and had personally "responded to over 100 police shootings." He was a State's witness before the Grand Jury in this case. The State subsequently made the tactical decision, however, not to call him as a trial witness.

With respect to his authorship of the guidelines in this case, Lieutenant Key testified:

Q: And can you *explain* to the ladies and gentlemen of the jury *your experience in police policy, training and procedures?*

A: As I said, I was a supervisor for 21 years. I have written in that time—I have no idea how many memorandums. *I've written specifically* the general order on hostage rescue/hostage barricade situations; *the use of force general order, the new use of force general order, the sections pertaining to lethal force; the training guidelines on use of force; a dozen or so lesson plans on use of force, officer survival;* a number of other memorandums for the agency, *in addition* to which *I wrote the state regulations for firearms for the Maryland Police Training Commission which were adopted into law by the Maryland Police Training Commission.*

Q: I'm going to show you what's been marked as Exhibit Number 26, called "Guidelines, Use of Force." Did you write these?

A: For the sake of brevity, it looks like it's complete, and *these are the ones that I wrote, yes.*

(Emphasis supplied).

The specific guidelines that were central to the State's case were those involving the "use of force." Lieutenant Key was not only the author of those guidelines, both in their original version and in the 1993–94 revision, but had testified in a number of courts as an expert witness on the subject of "use of force":

Q: Okay. Could you *explain* to the ladies and gentlemen *what use of force means* and, and how that—what your expertise in that is?

A: I've been qualified in probably 10, 11 courts, in the Circuit Court of Baltimore City in use of force. Also, the District Court for Rockbridge County, Virginia. The subject involves--*although I've been qualified both*

*as an expert in police and civilian use of force, gener-*
*ally first self-defense issues, those issues involving*
*specifically, in this case, police officers, what goes into*
*the circumstance of the use of force and what is reason-*
*able and appropriate in the officer's response to an*
*incident.*

(Emphasis supplied).

Lieutenant Key pointed out that in writing the guidelines, the general orders, and the lesson plans with respect to the use of firearms, he took a number of factors into consideration:

Q: Let's talk about guidelines for a moment. *Explain* to the jury *the different elements you considered when you wrote training guidelines, lesson plans, general orders, and the state regulation pertinent to the firearms training.*

A: The writing of guidelines for police officers has to take in that whole body of information that the officer needs to function on the street. Involved in that is law, specific regulation, the officer survival concepts that we've heard discussed over the period of time of this trial. So that *when the guideline comes out, it has to recognize certain bodies of information, some of which are regulatory, some of which are guides.*

(Emphasis supplied).

He further explained the differences that separate a law from a regulation and a regulation from a guideline and the fact that even the violation of a regulation would only subject the violator to administrative charges:

Q: [T]ell the ladies and gentlemen of the jury the difference between a guideline, a law, a regulation?

A: Well, the laws, of course, are the laws that we all have to abide by. Police officers are not exempt from that. There is a body of law involving police officer use of force that gets involved in the regulation. Those are absolutes. The regulation is an absolute. . . .

When asked what the sanction would be for violating a regulation, Lieutenant Key responded:

A: Then he could be subject to administrative charges.

Q: Not criminal charges?

A: No, sir.

Lieutenant Key then contrasted a guideline with a regulation and testified specifically with respect to State's Exhibit No. 26, which was a nine-page set of guidelines governing the use of deadly force that had been published in May of 1995 and had been written by Lieutenant Key himself:

A: *The guideline is created to guide the officers. It's exactly what it says it is, a guide. It's discretionary to some extent and within the policy.* Specifically to these guidelines, I incorporated them by reference into general order having to do with use of force for the purpose of the agency being able to determine what they wanted the officer to do by being able to bring administrative charges against them.

Q: When you say "guidelines," are you referring to what's been previously marked as Defense Exhibit—State's Exhibit Number 26?

A: Yes, sir, I am.

Q: *And is it your testimony [that] these guidelines were not written as law?*

A: *No, sir, they are not.*

(Emphasis supplied).

Lieutenant Key testified that the "regulation" applicable to Sergeant Pagotto's conduct on the night of February 7, 1996 was that he report to the Homicide Squad. Lieutenant Key, who responded to the shooting of Preston Barnes that night, further testified that Sergeant Pagotto fully complied with any applicable regulations:

Q: Did Sgt. Pagotto abide by Department regulations on the night of February the 7 [th]?

A: Yes, sir, he did.

Lieutenant Key further distinguished between failures to follow a guideline which related to training (and would indicate that some retraining is required) and policy violations. He testified further that the alleged guideline violations at issue in this case, even if they occurred, were in no event policy violations:

Q: [T]he ones we're talking about here were all discretionary?

A: Yes, sir, they are.

Q: They were not policy violations?

A: No, sir.

In terms of the significance and the gravity of any arguable violation of a departmental guideline by Sergeant Pagotto, Lieutenant Key's testimony as to that significance was the only evidence in the case.

### State v. Albrecht Distinguished

In arguing for legal sufficiency, the State relies heavily on *State v. Albrecht*, 336 Md. 475, 649 A.2d 336 (1994), and there are, indeed, surface similarities between that case and this. In that case, a Montgomery County police officer was convicted of involuntary manslaughter and of two counts of reckless endangerment when the shotgun he was holding accidentally discharged, killing Rebecca Garnett and endangering several others. On closer inspection, however, that case is not at all dispositive of this one.

Before turning to five distinctions which we believe to be critical, we note, in passing, two other lesser differences between the two cases. Because *Albrecht* was a court trial rather than a jury trial, there was at the end of the case no formal analysis of the burden of production *per se*. Unlike the situation where the judge, as legal referee, must make a deliberate decision to submit the case to a fact-finding jury, the judge in a non-jury case tends to glide almost subconsciously from his role as legal referee into his very different role as fact finder with little or no pause to mark the transition. Although, to be sure, appellate review of the two trial

modes involves the same measure of legal sufficiency, the *Albrecht* opinion nonetheless had little occasion to analyze the burden of production as such. *Albrecht* held that the evidence, if given maximum weight, would support the verdicts. It had no occasion to ask whether the fact finder should have engaged in the weighing process.

A factual difference between the two cases is that the physical confrontation in *Albrecht* took place in daylight, at 7 P.M. in late May, in the presence of a number of witnesses out on the street and surrounding sidewalks at that hour. The confrontation in this case took place in the dark, at 8:30 P.M. on an icy February night, on an apparently deserted street.

In addition to these lesser distinctions, the Court of Appeals in *Albrecht* found of express significance five factors that differ dramatically from the corresponding factors in this case.

### A. A Shotgun Versus a Handgun:

Much mention was made in the *Albrecht* opinion of the fact that the officer there unlimbered a shotgun instead of a handgun and of the heightened justification required before making such a deliberate choice of a weapon. "[W]e find that there was sufficient evidence presented from which the trial court could have concluded that Albrecht was both grossly negligent and reckless in failing to exercise the extreme caution that he was required to exercise in the handling and the use of his shotgun." 336 Md. at 486, 649 A.2d 336. "According to Muelenhort, an officer's shotgun is considered the 'ultimate weapon to utilize' and constitutes the highest level of force that an officer may use to respond to a particular situation." 336 Md. at 490, 649 A.2d 336. "[T]he officer must be able to articulate a clear and present danger to himself or others before the shotgun may be used." *Id.* "McNally stated that the shotgun is 'more of an offensive weapon' than a handgun because the shotgun discharges 'multiple projectiles,' creating 'a better chance of the officer hitting whatever it is he's intending on shooting at.'" 336 Md. at 492, 649 A.2d 336. "Former Sergeant Raymond Griffin ... stated that the shot-

gun is a 'particularly dangerous weapon' which 'creates a pattern of destruction' when used, and that an officer must exercise 'extreme caution' in the use of that weapon." 336 Md. at 493–94, 649 A.2d 336. In our case, by contrast, Sergeant Pagotto was carrying only a standard handgun and not a shotgun.

### B. *The Placement of the Trigger Finger:*

More than on any other single factor, the *Albrecht* decision relied on the fact that the officer's finger was literally on the trigger, enhancing thereby the risk of accidental discharge. "We find that the evidence was sufficient to establish that ... Albrecht took substantial steps to use deadly force against her—to wit, racking his shotgun and aiming it, *with his finger on the trigger*, at Garnett." 336 Md. at 486, 649 A.2d 336 (emphasis supplied). "McNally further testified that police candidates were instructed that an officer's trigger finger should be kept on the trigger guard and away from the trigger." 336 Md. at 492, 649 A.2d 336. "[Griffin] testified that an officer should not place his finger on the shotgun's trigger unless and until the officer believes that he may have to shoot the suspect." 336 Md. at 494, 649 A.2d 336. Officer Albrecht, indeed, testified that his finger was on the trigger. 336 Md. at 497, 649 A.2d 336. The final holding was that the evidence permitted a finding that the officer brought his gun to bear on the victim *"with his finger on the trigger."* 336 Md. at 505, 649 A.2d 336 (emphasis in original).

In the present case, Sergeant Pagotto testified that his finger was never intentionally on the trigger and no witness offered any testimony to the contrary. As a matter of physics, on the other hand, there is a logical inference that the finger must have been on the trigger at the moment it was fired. Whether it was there at some time prior to the Sergeant's apparent clutching motion as he was pushed to the ground, however, is pure speculation. In marked contrast to *Albrecht,* the only direct evidence was that his finger was outside the trigger guard, although admittedly along the slide of the weapon rather than literally underneath the trigger

guard. Lieutenant Meiklejohn, the Director of Training for the Montgomery County Police Department and also a key expert witness in the *Albrecht* case, testified that Sergeant Pagotto's placement of his finger along the slide of the automatic would have been an authorized action in Montgomery County and, indeed, in every jurisdiction in Maryland except for Baltimore City. The importance of this is that for a common law felony such as manslaughter, the quality of gross criminal negligence has to be something inherently dangerous, something of a *malum in se* character, rather than a mere *malum-prohibitum*-type of regulatory violation that may vary from year to year and from county to county. The placement of the trigger finger in *Albrecht* was generally, if not universally, prohibited; the placement of the trigger finger in this case was almost universally accepted. It is obviously not deemed to be an *inherently* reckless and wanton and thereby criminal act.

## C. *The Aiming of the Weapon at the Victim:*

In *Albrecht,* the officer enhanced the danger to the victim by deliberately fixing the victim in his gunsights. "Witnesses at the scene testified that Albrecht, looking down the barrel of the gun, aimed his shotgun directly at Garnett." 336 Md. at 481, 649 A.2d 336. "Albrecht testified that he kept his shotgun pointed at Garnett." *Id.* "Albrecht was steadily holding the shotgun and directly aiming it at Garnett at the time that the weapon discharged." 336 Md. at 482, 649 A.2d 336. "Albrecht took substantial steps to use deadly force against her—to wit, racking his shotgun and aiming it . . . at Garnett." 336 Md. at 486, 649 A.2d 336.

Although Damien Jackson and Ali Austin testified that the appellant had earlier pointed his weapon at Preston Barnes through the open driver's door, the only testimony with respect to the gun after the Subaru began to move was that Sergeant Pagotto was not aiming his weapon at Preston Barnes when it discharged and that the gun only went off after Barnes drove the Subaru into Sergeant Pagotto's body causing his gun hand to crash into the left rear window. The

trajectory of the fatal bullet, through the rear window rather than through the open front door, bears that out.

### D. *The Status of the Victim As One No Longer Posing a Threat:*

It was important to the *Albrecht* decision that Rebecca Garnett, at whom the shotgun was aimed with a finger on the trigger, no longer posed any threat to the officer who had her in his gunsight. "Albrecht ... decided that she did not pose any danger to him" and "check[ed] off Garnett as a threat." 336 Md. at 481, 649 A.2d 336. "We find that the evidence was sufficient to establish that ... Rebecca Garnett did not pose any danger to either Albrecht himself or to third parties." 336 Md. at 486, 649 A.2d 336. "Albrecht admitted ... that he did not feel threatened by Rebecca Garnett." 336 Md. at 495, 649 A.2d 336. "Albrecht repeatedly testified that ... he had 'checked her off,' and that 'she was the least of his worries.'" 336 Md. at 496, 649 A.2d 336. The final holding was that the evidence supported the conclusion that the officer was unreasonable in bringing the shotgun to bear "on an unarmed individual who did not present a threat." 336 Md. at 505, 649 A.2d 336. Rebecca Garnett was standing still, some distance away from the car, with her hands in full view holding a bag of potato chips.

Preston Barnes, by contrast, posed a continuing threat to Sergeant Pagotto. From the outset, Sergeant Pagotto feared that Barnes might be armed. Barnes was inside the car, making suspicious motions, and his hands were not in view. In no conceivable way had Preston Barnes, unlike Rebecca Garnett, been eliminated as a threat.

### E. *Compliance With Police Commands:*

In the *Albrecht* case, Rebecca Garnett and the two others who had been with her were fully complying with the police commands at the moment the shotgun discharged. The fact-finding judge referred to "the lack of threats posed by the suspects, *given their essential compliance* with [the officer's] shouted commands." 336 Md. at 484, 649 A.2d 336 (emphasis

supplied). Albrecht himself testified, "I was thinking to myself, 'Okay. *She has complied.*'" 336 Md. at 497, 649 A.2d 336 (emphasis supplied).

In diametric contrast, Preston Barnes aggressively resisted rather than complied with the lawful police commands. Instead of stopping the car when he was lawfully ordered to do so, he deliberately allowed it to continue to drift. Instead of putting on the emergency brake and placing his hands on the dashboard when he was lawfully directed to do so, he argued with Sergeant Pagotto, protesting that he had not done anything wrong. When Sergeant Pagotto opened the door wider and reached inside the Subaru, Barnes presumed to struggle with him instead of doing what he was ordered to do. We know, moreover, that Barnes's tactical plan all along had been to make a sudden vehicular getaway from the scene of his detention. Immediately before Sergeant Pagotto's weapon went off, Preston Barnes deliberately "revved up" the motor and turned the car into Sergeant Pagotto's body as the car began to accelerate. Far from complying, Preston Barnes was literally assaulting Sergeant Pagotto, with an automobile as the weapon, at the moment the gun went off.

## F. *Conclusion:*

This case, key factor by key factor, is the diametric opposite of *Albrecht.* The contrast, moreover, highlights the deficiency of the evidence of gross negligence in this case. Even in *Albrecht* the evidence was close. Here, it did not get close.

### The *Mens Rea* of Reckless Endangerment Is No Less Than the *Mens Rea* of Gross– Negligence Manslaughter

Sergeant Pagotto was convicted, under two separate counts, of the reckless endangerment of both Damien Jackson and Ali Austin as well as of the involuntary manslaughter of Preston Barnes. A single set of facts, a single state of mind on Sergeant Pagotto's part served as the predicate for all three convictions. Our review of the legal sufficiency of the evi-

dence, therefore, is effectively reduced from three reviews to a single review.

The crime of Reckless Endangerment was created by Ch. 969 of the Acts of 1989 and is now codified as Art. 27, § 12A–2. Section 12A–2(a) provides:

(a) *Creation of substantial risk of death or serious physical injury; penalties.*—(1) Any person who recklessly engages in conduct that creates a substantial risk of death or serious physical injury to another person is guilty of the misdemeanor of reckless endangerment and on conviction is subject to a fine of not more than $5,000 or imprisonment for not more than 5 years or both.

As Judge Bishop pointed out for this Court in *Minor v. State,* 85 Md.App. 305, 314–15, 583 A.2d 1102 (1991), *aff'd,* 326 Md. 436, 605 A.2d 138 (1992), the language of the new Maryland statute employs substantially the language of § 211.2 of the Model Penal Code. Although Maryland has not adopted the Model Penal Code itself or its definition of "reckless," a part of that definition, contained in § 2.02(2)(c), was tracked, almost word for word, by the Court of Appeals in *Minor v. State,* 326 Md. 436, 443, 605 A.2d 138 (1992). Model Penal Code and Commentaries § 2.02 (Official Draft and Revised Comments 1985), defines "recklessly" as follows:

A person acts recklessly with respect to a material element of an offense when he consciously disregards a substantial and unjustifiable risk that the material element exists or will result from his conduct. The risk must be of such nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him, its disregard involves *a gross deviation from the standard of conduct that a law-abiding person would observe* in the actor's situation.

(Emphasis supplied).

In *Minor v. State,* 326 Md. at 443, 605 A.2d 138, Chief Judge Murphy set out the test for recklessness in this state:

The test is whether the appellant's misconduct, viewed objectively, was so reckless as to constitute *a gross depar-*

*ture from the standard of conduct that a law-abiding person would observe,* and thereby create the substantial risk that the statute was designed to punish.

(Emphasis supplied).

In *State v. Albrecht,* 336 Md. 475, 649 A.2d 336, the Court of Appeals essentially treated the *mens rea* of reckless endangerment and the *mens rea* of involuntary manslaughter as a single and indistinguishable phenomenon. It set its mission of reviewing the legal sufficiency of the evidence in the following terms:

> As Judge Messitte noted, the "overriding question" in this case was whether Albrecht's conduct constituted a "gross and wanton deviation from reasonable conduct" such as would support convictions of involuntary manslaughter and reckless endangerment. As such, the evidence presented at trial, both in the form of documentary and testimonial evidence, focused upon the issue of whether Albrecht had acted as a reasonable police officer under the circumstances.

336 Md. at 486–87, 649 A.2d 336.

In *Williams v. State,* 100 Md.App. 468, 474, 641 A.2d 990 (1994), we essentially treated *mentes rei* of the respective crimes as one and the same:

> The state of mind of recklessness, in the context of reckless endangerment as well as in other criminal contexts such as depraved heart murder and possibly grossly negligent manslaughter, is variously described as *an attitude wherein the criminal agent,* conscious of the life-endangering risk involved, *nonetheless acts with a conscious disregard of or wanton indifference to the consequences.*

(Emphasis supplied).

██ Although it is not necessary to decide in this case, it is conceivable that, in terms of the consciousness of risk, there is a slightly heavier content to the *mens rea* of reckless endangerment than there is to the *mens rea* of gross-negligence manslaughter. This is a very real possibility because reckless endangerment is probably the inchoate form of depraved-heart murder as surely as it is the inchoate form of gross-

negligence manslaughter. The consciousness of risk, however, is not a factor in this case. One thing that is sure is that the *mens rea* of gross-negligence manslaughter is the minimal content of the *mens rea* of reckless endangerment. If, therefore, the evidence in this case is not legally sufficient to support a conviction for involuntary manslaughter, as we hold it is not, it is *ipso facto* legally insufficient to support the convictions for reckless endangerment.

### The Burden of Production Beyond Mere Negligence: The Manslaughter Cases

We turn our attention to the *mens rea* of involuntary manslaughter. Evidence of some negligence does not, *ipso facto*, satisfy the production burden with respect to gross criminal negligence and it is not permissible to delegate the ultimate decision in that regard to the unreviewable weighing process of the jury. The legal control gate is in place for the precise purpose of limiting the evidence of negligence that may be weighed by the fact finders as a predicate for possible criminality.

In *Thomas v. State*, 206 Md. 49, 109 A.2d 909 (1954), two children were killed by a truck driven by Thomas allegedly "in a grossly negligent manner." A Montgomery County trial judge, sitting without a jury, found Thomas guilty of two separate counts of automobile manslaughter. After equating statutory gross negligence with common law gross negligence, 206 Md. at 51, 109 A.2d 909, Chief Judge Brune observed that the evidence could have supported a finding of some negligence in three separate regards:

> This rather full review of the evidence shows that there were only three factors from which gross negligence might be deduced: (1) excessive speed; (2) defective brakes; and (3) intoxication.

206 Md. at 55, 109 A.2d 909.

With respect to the possibility that Thomas was violating the speed limit, the Court of Appeals noted that "[i]f it was exceeded, it was not greatly exceeded." 206 Md. at 55–56, 109

A.2d 909. Chief Judge Brune noted that the trial judge seemed to have inferred that there was some negligence but not gross negligence. Significantly, the Court of Appeals, reviewing the evidence as a matter of law, concluded that there was no legally sufficient evidence of gross negligence:

> Though the comments of the learned trial judge at the conclusion of the testimony indicate that *he considered the speed at that point greater than it should have been and, we infer, negligent,* he did not, as we read his comments, find it such as to indicate gross negligence. Neither do we.

206 Md. at 56, 109 A.2d 909 (emphasis supplied).

With respect to the possible finding that Thomas continued to drive the truck even with the knowledge that the brakes were defective, the Court of Appeals concluded that such conduct, even if ill-advised, was not legally sufficient to permit a finding of a "wanton or reckless disregard for human life":

> In this Court, the State seeks to establish negligence on the part of the appellant because he continued to operate the truck despite his knowledge that the brakes were defective....Even if the contention made by the State in this Court is open to it, *we think the evidence is insufficient to support a charge of gross negligence against the appellant.* He duly and promptly reported the unsatisfactory condition of the brakes to his superior after they had supposedly been repaired, and he was ordered to go on using the truck until it could be spared for further repairs. *The defects in the brakes do not appear to have been so great or of such a nature as to indicate that the continued operation of the truck would amount to "wanton or reckless disregard for human life."*

206 Md. at 56, 109 A.2d 909 (emphasis supplied).

It was the evidence of intoxication that the fact finder found weighty enough to constitute gross criminal negligence. The fatal accident occurred at 3:30 P.M. The undisputed evidence showed that the nineteen-year-old driver had consumed six bottles of beer that day, two of which were consumed a few minutes before the occurrence of the accident. The Montgomery County detective who first arrived at the accident scene

smelled alcohol on Thomas's breath. Notwithstanding such evidence and the significance given to it by the fact finder, the Court of Appeals held that the evidence of intoxication was not legally sufficient to have permitted a finding that Thomas was guilty of gross negligence:

> In our opinion, the evidence with regard to intoxication was not sufficient to warrant a finding that the appellant was guilty of gross negligence within the established meaning of the statute in operating the truck at the time of the occurrence of the tragic accident.

206 Md. at 57–58, 109 A.2d 909.

In *Johnson v. State*, 213 Md. 527, 132 A.2d 853 (1957), a Baltimore City judge, in a non-jury case, found the appellant guilty of automobile manslaughter primarily on the basis of excessive speed. There was also evidence from the investigating officer that the appellant "had an odor of alcohol on his breath." The version of the evidence most favorable to the State was that the appellant was operating his vehicle on a Baltimore City street at "about 60 miles per hour." Because the street was in a commercial area and because the time was almost 2 A.M., however, the Court of Appeals, speaking through Chief Judge Brune, held that the speeding, even though enough to establish civil negligence, was not legally sufficient to permit a finding of gross negligence:

> *His speed may well have been such as to establish ordinary negligence* for which he would be liable in a civil suit, *but that is not the test under our manslaughter statute,* which imposes a penalty only for gross negligence.

213 Md. at 532, 132 A.2d 853 (emphasis supplied). The Court of Appeals went on to point out that even evidence of negligent conduct does not necessarily permit a finding that it "amount[ed] to criminal indifference to consequences":

> *The speed* that was indulged in, at the time and in the place, in the case at bar *is not such that amounts to criminal indifference to consequences.*

213 Md. at 534, 132 A.2d 853 (emphasis supplied).

In *Plummer v. State*, 118 Md.App. 244, 702 A.2d 453 (1997), a Montgomery County jury found the appellant guilty of

manslaughter by automobile. Although the evidence permitted a finding that the appellant was operating his vehicle slightly in excess of the thirty-miles-per-hour speed limit, that was clearly not the basis for the jury's verdict. The accident occurred at 2:30 in the afternoon as the twelve-year-old victim was walking home from school. The appellant's vehicle, apparently because of the appellant's inattention, drifted to the right and proceeded up onto the sidewalk where it struck the victim from the rear. A witness, driving behind the appellant, saw the appellant beginning to drift and blew his horn and flashed his high-beams in an effort to get his attention. After the accident, the appellant fled the scene.

After a thorough analysis of the case law distinguishing ordinary civil negligence from gross criminal negligence, Judge Thieme observed with respect to the appellant:

> There is little doubt in our minds that *the actions of the appellant* on 22 December 1995 *were reprehensible, immoral, and callous. We can think of many other terms to describe the appellant* for being directly responsible for the death of a twelve-year-old girl as she strolled home from school ... *"Murderer," however, is not one of those terms.*

118 Md.App. at 254, 702 A.2d 453 (footnote omitted; emphasis supplied).

The State argued that because the appellant was driving through a school zone, he had a heightened duty to maintain a proper lookout. In holding that the evidence was not legally sufficient to have permitted the trial judge to submit the manslaughter charge to the jury, the Court of Special Appeals rejected that contention by the State:

> The State relies heavily on the fact that the accident occurred in a school zone and that the appellant, because he failed to maintain a proper lookout in such an area, was therefore grossly negligent. We disagree.

118 Md.App. at 267, 702 A.2d 453.

The Court of Special Appeals also held that evidence that the appellant fled the scene was not a sufficient predicate for a finding of gross criminal negligence:

It is also uncontested that the appellant fled the scene after the accident. Granted, flight is a factor to consider, but given the fact that the only evidence of irregular driving was the appellant's brief drift to the shoulder and the curb, *flight from the scene cannot support a finding of gross negligence.... [T]he appellant's choice not to stop and render aid, while morally inexcusable, may have amounted to no more than the manifestation of his own fright and disbelief. We do not think that such flight,* under the circumstances, *demonstrates that the appellant cared so little about what he had done as to render him grossly negligent.*

118 Md.App. at 268, 702 A.2d 453 (emphasis supplied).

The appellant was unquestionably negligent and that negligence resulted in "sheer tragedy." The Court of Special Appeals nonetheless reversed the conviction and held that the negligence was not of such an "extraordinary or outrageous character" as to have permitted the jury to speculate on whether it constituted manslaughter:

The reason for the appellant's departure from the travel portion of the roadway is and forever will be unknown. He may have dozed off at the wheel; he may have been changing the radio station; he may have been reading directions; he may have spotted something across the street that caught his attention. *That he should have paid 100% attention to the roadway in front of him is without question.* Nevertheless, *his brief lack of attention, even though it resulted in sheer tragedy, was not of such "extraordinary or outrageous character" as to rise to the level of gross negligence capable of sustaining a conviction for automobile manslaughter.*

118 Md.App. at 269, 702 A.2d 453 (emphasis supplied).

It is the lesson of *Thomas v. State, Johnson v. State,* and *Plummer v. State* that it is no adequate answer to say that the jury heard both the State's position and the defendant's position and then, properly instructed, rendered its verdict. It must also be determined as a matter of law, first by the trial judge and then by the appellate court, whether the legal

threshold was crossed so as to permit the jury to consider a verdict of possible criminality.

### The Burden of Production Beyond Mere Negligence: The Punitive Damage Cases

With respect to that special quality of wantonness and abandon that may transform a negligent tort into a negligent crime, we need not look to the manslaughter cases alone. Precisely the same standard of gross negligence is also an integral part of Maryland tort law, as the minimal mental state that will permit the awarding of punitive damages. The employment of the same gross negligence standard is appropriate because an award for punitive damages in a tort case and a criminal prosecution share the common denominator purpose of **DETERRING** negligence of "an extraordinary or outrageous character" that manifests a "wanton or reckless disregard of human life."

It was the landmark opinion of Judge Levine for the Court of Appeals in *Smith v. Gray Concrete Pipe Co.*, 267 Md. 149, 168, 297 A.2d 721 (1972), that first established the absolute equivalency of gross negligence in the context of automobile manslaughter prosecutions and gross negligence as the necessary minimal condition for an award of punitive damages in tort actions:

> We regard a "wanton or reckless disregard for human life" in the operation of a motor vehicle, with the known dangers and risks attendant to such conduct, as the legal equivalent of malice. It is a standard which, although stopping just short of wilful or intentional injury, contemplates conduct which is of an extraordinary or outrageous character. Yet, it is both a functional and definitive test which, as we have noted, enjoys the virtue of having been frequently applied in this state. And if, as a test, it has been regarded as adequately stringent to serve as a basis for possible imprisonment, then, surely, there appears to be no valid reason for deeming it too liberal for imposing civil sanctions. We hold that it is the standard by which claims for exemplary damages arising out of motor vehicle operation are to be tested.

The eighteen-year-old driver of a truck in the accident that caused the death of a minor 1) undertook to operate the truck without having first inspected it to determine its mechanical condition; 2) failed, when the hood flew up, to pull the truck to the side of the roadway and instead pulled it into the center lane of a 70–miles–per–hour interstate highway; and 3) knew or should have known that the truck a) was precariously loaded, b) was impossible to control in excess of 50 miles per hour, c) was in violation of many requirements of law, and d) had a hood that was precariously fastened and might come undone at any time. 267 Md. at 170–71, 297 A.2d 721. The Court of Appeals held that that "[c]onstitut[ed] sufficient negligence to support a claim for compensatory damages" but did not represent "a wanton or reckless disregard for human life."

> With respect to the claim against Edwards in count four, *we are of the view that said conduct, although constituting sufficient negligence to support a claim for compensatory damages, does not mount up to "a wanton or reckless disregard for human life."* Simply stated, there is absent the "extraordinary or outrageous" conduct on Edwards' part which we have said must attend the operation of a motor vehicle in order to sustain a claim for exemplary damages. What plaintiffs allege is a breach of duty by Edwards in operating a truck without being assured of its condition, and a failure to respond correctly to the emergency confronting him when the hood flew up. *The failure to respond properly under exigent circumstances underscores the very distinction we make between a situation reflecting "mere" negligence, for which compensatory damages are available, and that which we say may entitle an injured party to exemplary damages.*

267 Md. at 171, 297 A.2d 721 (emphasis supplied).

The trucking company, on the other hand, charged with the negligent entrustment of the truck to the driver was held to have been grossly negligent and was ordered to pay punitive damages. The thing that distinguished the case against the

driver from the case against the trucking company was the presence versus the absence of "the pressures of a highway crisis."

The salient feature of the case at bar is that the conduct of Gray which subjects it to possible exemplary damages did not occur under *the pressures of a highway crisis,* where *what might superficially appear to be caused by "extraordinary or outrageous conduct" could be merely the result of poor judgment exercised under such circumstances.*

267 Md. at 172, 297 A.2d 721 (emphasis supplied).

In *Medina v. Meilhammer,* 62 Md.App. 239, 489 A.2d 35 (1985), a two-year-old child was badly burned when he fell or jumped into a hole filled with scalding water left unattended by workers repairing a broken hot water pipe at an apartment complex. This Court distinguished ordinary negligence from gross negligence, affirmed a $400,000 award for compensatory damages, and reversed a $300,000 award for punitive damages:

*It is clear that the actions of appellants amounted to negligence* but ... we must decide whether that is "an aggravated form of negligence, differing in quality rather than in degree from ordinary lack of care" and is "more than any mere mistake resulting in inexperience, excitement, or confusion ...; more than mere thoughtlessness or inadvertence, or simple inattention."

The quantity of the negligence in this case does not change the quality of that negligence so that it becomes different from ordinary lack of care. *We hold that the conduct of appellants in this case, while clearly negligent, was not so extraordinary or outrageous as to raise that conduct to the qualitative level necessary to establish a foundation for the award of punitive damages.*

62 Md.App. at 251–52, 489 A.2d 35 (citation omitted; emphasis supplied).

In *Nast v. Lockett,* 312 Md. 343, 351, 539 A.2d 1113 (1988), Judge Orth reaffirmed that the test for gross negligence is the same in a manslaughter prosecution and in a tort claim for punitive damages:

*[T]he test in a civil automobile accident action for the submission of the award of punitive damages to the trier of fact is the same as the test in a criminal prosecution of manslaughter by automobile for the submission of the question of the guilt of the accused to the trier of fact.*

(Emphasis supplied). Judge Orth also reaffirmed that the test for gross negligence is a stringent one:

*Only conduct that is of an extraordinary or outrageous character will be sufficient* to imply this state of mind.... *Simple negligence will not be sufficient*—even reckless driving may not be enough. It is not reckless driving that allows punitive damages; it is the reckless disregard for human life. *Reckless driving may be a strong indicator, but unless it is of an extraordinary or outrageous character, it will ordinarily not be sufficient.*

312 Md. at 352, 539 A.2d 1113 (emphasis supplied).

With respect to one of the drivers charged with negligence, the Court of Appeals held, 312 Md. at 366, 539 A.2d 1113, that evidence of driving under the influence of alcohol (but short of intoxication) and evidence of several traffic law violations were not enough to require submitting the issue of punitive damages to the jury:

[T]he evidence as to Lockett was legally sufficient to establish that she was driving while under the influence of alcohol, but was not legally sufficient to show that she was intoxicated. *The degree of her impairment,* not having reached the level of intoxication, *would not, without more, be sufficient to elevate her simple negligence to gross negligence. Nor would the evidence as to her traffic law violations be legally sufficient in itself to show that she had a wanton or reckless disregard for human life.*

(Footnote omitted; emphasis supplied).

### The Burden of Production Beyond Mere Negligence: The Governmental Immunity Cases

For purposes of evaluating gross negligence in a manslaughter case and the burden of production with respect to it, the punitive-damage case law is not the only analogue we

have. In certain instances, a governmental employee performing a discretionary function in a non-malicious way who would otherwise enjoy immunity could lose that immunity if his conduct involved gross negligence. Those cases are particularly pertinent to the case *sub judice* because they involve dangerous and clearly negligent actions by law enforcement officers and other governmental personnel.

 Section 19–103(b) of the Transportation Article confers immunity on operators of emergency vehicles for ordinary negligence but does not confer immunity if the operator, *inter alia*, was guilty of gross negligence. *Boyer v. State*, 323 Md. 558, 594 A.2d 121 (1991), was a case in which two persons were killed after being hit by a drunken driver involved in a high-speed chase with the State Police. A State Trooper was charged with gross negligence for having engaged in a seven-mile chase with a drunken driver through heavy traffic and numerous intersections at speeds that were at times in excess of 100 miles per hour. It was also charged that the State Trooper failed to "activate immediately all of the emergency equipment on his police car." The trial judge granted summary judgment in favor of the State Trooper. After a thoroughly analyzed review of the gross negligence standard, Judge Eldridge affirmed that grant:

> Viewing the allegations in the light most favorable to the plaintiffs, we nevertheless hold that *Trooper Titus's alleged conduct did not amount to gross negligence as a matter of law. The plaintiffs' allegations* that Trooper Titus drove at high speeds on a road congested with traffic in an attempt to apprehend a suspected intoxicated driver *do not indicate that he acted with wanton or reckless disregard for the safety of others.* Although the complaint states that Trooper Titus did not "immediately" activate his emergency equipment and violated police procedures, these somewhat vague allegations do not support the conclusion that he acted with gross negligence.

323 Md. at 580, 594 A.2d 121 (emphasis supplied).

. In *Khawaja v. City of Rockville,* 89 Md.App. 314, 598 A.2d 489 (1991), the plaintiffs were badly injured in a collision with

a police cruiser driven by a sergeant of the Montgomery County Police Department. It was alleged that the sergeant, in responding to an emergency call, deliberately failed to activate the cruiser's siren and ran a red light through an intersection with the victim's automobile in view. After an extensive review of the case law on gross negligence in both the governmental immunity cases and the punitive damage cases, this Court affirmed the trial judge's dismissal of the complaint because "these facts do not set forth a cause of action in gross negligence." 89 Md.App. at 318, 598 A.2d 489.

In *Wells v. State,* 100 Md.App. 693, 642 A.2d 879 (1994), employees of the State Department of Human Resources and the Baltimore City Department of Social Services were charged with gross negligence by omission in failing to take steps to correct an egregious case of child abuse. The opinion for this Court by Chief Judge Wilner affirmed the dismissal of the complaint, holding that although the allegations suggested ordinary negligence, they did not spell out a case of gross negligence:

> *These allegations, taken in a light most favorable to appellants, suggest individual negligence and bureaucratic mismanagement and incompetence;* they suggest a critically important governmental unit not properly doing its job because of underfunding, understaffing, lack of effective leadership and supervision, lack of training, and lack of clear procedures and protocols. *They do not indicate, however, malice, evil intention, or wanton, wilful, or reckless disregard for human life or the rights of others. In short, they do not allege gross negligence* on the part of any of the defendants.

100 Md.App. at 705–06, 642 A.2d 879 (emphasis supplied). *See also Foor v. Juvenile Services,* 78 Md.App. 151, 170, 552 A.2d 947 (1989); *Tatum v. Gigliotti,* 80 Md.App. 559, 571, 565 A.2d 354 (1989), *aff'd,* 321 Md. 623, 583 A.2d 1062 (1991).

A *prima facie* case of gross negligence is the legal threshold that must be crossed before a charge of manslaughter may even be submitted to a jury. All of the governmental immuni-

ty cases discussed and all of the punitive damages cases discussed make it clear that a *prima facie* case of negligence is not, *ipso facto*, a *prima facie* case of gross negligence.

### The Persuasive Authority of the Civil Rights Cases

This case is unusual in that it involves *a criminal prosecution* of a police officer for the involuntary manslaughter of a civilian. Where a police officer in the course of his duties shoots and wounds or shoots and kills a civilian, such a case, in recent decades, typically has resulted in a suit, federal or state, charging a violation of the victim's civil rights, frequently under 42 U.S.C. § 1983. The claim is typically that the officer is guilty of the violation by virtue of having unreasonably used excessive force. Our case also involves the allegedly unreasonable use of excessive force. It involves the allegedly negligent and unreasonable creation of an enhanced risk that excessive force will accidentally be unleashed.

These § 1983 cases provide a helpful benchmark for measuring the case now before us, for it is in the context of § 1983 civil rights claims that most of the case law with respect to the alleged use of excessive force by a police officer is to be found. There are not many manslaughter cases brought against police officers and we must look, therefore, to the § 1983 cases to see how other courts are handling this situation. The prevailing standard of objective reasonableness used in measuring § 1983 claims, moreover, is clearly apposite to the case before us, for it overlaps, though it is less demanding than, the standard of wanton and reckless disregard of human life necessary for a manslaughter conviction. While some police actions that might be deemed unreasonable in the § 1983 context may still fall short of the standard of gross criminal negligence, the converse is not true. A police action deemed to be reasonable in the § 1983 context could clearly not be the basis for a finding of gross criminal negligence on the part of the officer.

The landmark case establishing the standard for measuring claims that an officer used excessive force is *Graham v.*

*Connor,* 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). The standard is that of objective reasonableness under the Fourth Amendment. The Supreme Court stated that standard, 490 U.S. at 395, 109 S.Ct. 1865:

> *[A]ll* claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other "seizure" of a free citizen should be analyzed under the Fourth Amendment and its "reasonableness" standard.

(Emphasis in original). The Supreme Court, moreover, articulated the appreciation of the stress of combat-like conditions that should illuminate the assessment of the reasonableness of the officer in using force:

> With respect to a claim of excessive force, the same standard of reasonableness at the moment applies: "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers," violates the Fourth amendment. *The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.*

490 U.S. at 396–97, 109 S.Ct. 1865 (citation omitted; emphasis supplied).

The Supreme Court also noted that among the circumstances bearing on the reasonableness of the use of force, significant questions are:

> whether the suspect poses an immediate threat to the safety of the officers or others, and *whether he is actively resisting arrest or attempting to evade arrest by flight.*

490 U.S. at 396, 109 S.Ct. 1865 (emphasis supplied). In this case, Preston Barnes was "actively resisting arrest" and was "attempting to evade arrest by flight."

The decision of the Court of Appeals for the Fourth Circuit in *Greenidge v. Ruffin,* 927 F.2d 789 (1991), is amazingly parallel to the case now before us. In that case, Baltimore City Police Officer Ernestine Ruffin, working for the Vice

Squad, observed a woman believed to be a prostitute entering a vehicle with a man on the evening of May 12, 1988. But for the guideline dealing with the placement of a trigger finger under the trigger guard, Officer Ruffin in 1988 would have been operating under essentially the same guidelines that applied to Sergeant Pagotto in 1996.

Officer Ruffin was in plain clothes and in an unmarked vehicle. She followed the suspect car until it stopped. She approached the car and observed an illegal sex act in progress. The Fourth Circuit, 927 F.2d at 790, described what happened next:

> With her police badge hanging from her neck, *Ruffin opened the door of the car with her left hand,* identified herself as a police officer, and ordered the two passengers to place their hands in view. When neither complied, *Ruffin pointed the drawn revolver in her right hand into the vehicle* and repeated the order. Ruffin then observed appellate Leonard Greenidge reach for a long cylindrical object from behind the seat, which she believed to be a shotgun (the object later turned out to be a wooden night-stick). Ruffin fired her weapon at Greenidge. The bullet struck him in the jaw and lodged near the spinal cord, causing permanent injury. Greenidge now slurs his speech, limps and is unable to work.

(Emphasis supplied).

The § 1983 suit charged Officer Ruffin with the unreasonable use of excessive force. For a mere sexual offense, a Baltimore City policewoman opened a car door with her left hand and then reached into the car with a loaded revolver in her right hand. The jury nonetheless found in favor of Officer Ruffin. The plaintiff's primary contention before the Fourth Circuit was that District Court Judge Motz had erroneously precluded him from introducing evidence of Officer Ruffin's "conduct leading up to the time immediately before the arrest." The plaintiff argued, as the State did in this case, that the officer's antecedent violations of various police procedures

were "an important part of the reasonableness inquiry." The Fourth Circuit summarized the plaintiff's contention:

> The police officer allegedly violated standard police procedure for night time prostitution arrests by not employing proper backup and not using a flashlight. *Appellant asserts that these facts are probative to the reasonableness inquiry because the appellee recklessly created a dangerous situation during the arrest.*

927 F.2d at 791 (emphasis supplied).

In almost *verbatim* terms, the State in this case claims that Sergeant Pagotto's alleged violations of "standard police procedures ... recklessly created a dangerous situation." Although Officer Ruffin's alleged violations of standard police procedure might have created, or at least contributed to, a dangerous situation, the Fourth Circuit affirmed Judge Motz's ruling that the plaintiff's reaching for a long cylindrical object created a supervening reality and that the antecedent actions by the officer, even if violations of standard police procedure, were immaterial and, therefore, inadmissible:

> In light of ... the Supreme Court's focus on the very moment when the officer makes the "split-second judgments," we are persuaded that *events which occurred before Officer Ruffin opened the car door and identified herself to the passengers are not probative of the reasonableness of Ruffin's decision to fire the shot.*

927 F.2d at 792 (emphasis supplied). By parity of reasoning, Preston Barnes's decision to flee the scene was a supervening reality causing the accidental discharge of the weapon.

In *Drewitt v. Pratt,* 999 F.2d 774 (4th Cir.1993), a Norfolk, Virginia police officer was working, during his off-duty hours, as a part-time security guard for a local Pizza Hut. When he observed a car being driven in a reckless manner, *he ran toward the vehicle with his service revolver drawn.* He was not in uniform at the time and did not display his police badge, which he carried in his pocket. The vehicle came to a stop. As the officer crossed in front of it to approach the driver's side, the vehicle's headlights came on and the vehicle moved

toward the officer. He fired one shot through the windshield of the car and then, as he fell from the hood of the car in the direction of its left front fender, a second bullet was accidentally discharged. Both hit the plaintiff.

In affirming the decision of the District Court judge to dismiss the complaint against the officer, the Fourth Circuit noted that while the officer's "failure to display his badge while attempting to execute a warrantless misdemeanor arrest ... may have violated Virginia statutory law," it was immaterial to the assessment of his later decision to fire his weapon:

[T]he failure of Officer Pratt to display his badge when announcing himself as a police officer and demanding Drewitt to stop his vehicle is irrelevant to the issue of whether at the moment of the shooting Officer Pratt had probable cause to believe that Drewitt posed a threat of death or serious bodily harm to him.

999 F.2d at 779.

In *Elliott v. Leavitt*, 99 F.3d 640 (4th Cir.1996), two Northern Virginia police officers arrested a motorist for drunken driving. They handcuffed him and conducted a cursory search for weapons before seating him in his automobile. They subsequently observed that he had managed, despite the handcuffs, to get control of a small handgun which he at that moment was pointing at the officers. They fired twenty-two bullets into him, killing him. In the § 1983 suit brought by the parents of the young man, the District Court judge ruled that the officers had been guilty of using "excessive force in the course of arresting Elliott for driving while intoxicated."

The Fourth Circuit reversed that decision, commenting that the "Constitution simply does not require police to gamble with their lives in the face of the serious threat of harm." 99 F.3d at 641. The Fourth Circuit also rejected the plaintiff's contention that the cursory nature of the initial search of the arrestee contributed to the dangerous condition:

Appellees make much of the fact that Leavitt searched Elliott only cursorily before placing him in the car. *Even assuming Leavitt should have conducted a more intensive*

*search, this issue is irrelevant to the excessive force inquiry. As we noted in Greenidge, Graham requires us to focus on the moment force was used; conduct prior to that moment is not relevant in determining whether an officer used reasonable force.*

99 F.3d at 643 (emphasis supplied).

In *Young v. Killeen,* 775 F.2d 1349 (5th Cir.1985), the plaintiff made the same argument that the State is making in this case. The § 1983 suit there was brought by the widow, after Officer Kenneth Olson shot and killed David Young on June 7, 1981. Young, with a friend, had driven to a parking lot where they bought marijuana from a pedestrian. The officer subsequently attempted to block Young's car by pulling his police vehicle in front of it. Officer Olson left his car and ordered Young and the passenger out of theirs. When Young apparently reached down toward the seat or toward the floor board, Officer Olson believed that Young was going for a gun. Officer Olson fired his weapon and the shot was fatal.

The District Court judge found that Officer Olson had acted unreasonably and was responsible for the death of David Young. He based that finding on *a number of violations of police procedure* on the part of Olson that the judge believed *created a greater danger of a fatal error.* The Fifth Circuit summarized the finding of the District Court:

*The district judge,* relying on the testimony of an expert witness on police procedure, *found that Olson acted negligently and contrary to good police procedure* in the following respects:

 (1) failure to use his radio;

 (2) failure to utilize a back-up unit;

 (3) dangerous placement of his patrol car in a "cut off" maneuver;

 (4) ordering the two men to exit their car rather than issuing an immobilization command to remain in the car with their hands in plain view;

(5) increasing the risk of an incident by having two suspects getting out of the car;

(6) abandoning a covered position and advancing into the open, where the odds of overreacting would be greater.

*The judge concluded that Olson's fault in this respect* not only placed Olson in a position of greater danger but also *imperiled Young by creating a situation where a fatal error was likely.*

775 F.2d at 1350 (emphasis supplied). The Fifth Circuit opinion again set out the reasoning of the District Court:

The sense in which he finds excessive force is that *the force would have been avoided if Olson had approached Young as required by proper police procedures.* ... The court expressly found that the six errors of police procedure enumerated above, "when taken together caused the death of David Young." ... [T]he court said: "While all witnesses agreed that at the moment David Young made a sudden movement Olson was justified in shooting, *it would be anomalous indeed to suppose that a police officer may escape liability where the dangerous situation was created entirely by the officer's disregard of prudent procedure.*"

775 F.2d at 1352 (emphasis supplied). The State's argument here is an echo of what the District Court judge found there— that "the dangerous situation was created entirely by [Sergeant Pagotto's] disregard of prudent procedure."

The Fifth Circuit reversed the District Court's decision. It held that merely creating a situation where the risk of a fatal accident is enhanced does not constitute the unreasonable use of excessive force:

*The only fault found against Olson was his negligence in creating a situation where the danger of such a mistake would exist.* We hold that no right is guaranteed by federal law that one will be free from circumstances where he will be endangered by the misinterpretation of his acts.

775 F.2d at 1353 (emphasis supplied).

In *Fraire v. Arlington,* 957 F.2d 1268 (5ᵗʰ Cir.1992), an Arlington, Texas police officer was dressed in plain clothes and

driving an unmarked car when he observed a pickup truck engaged in a number of acts of reckless driving. On at least three occasions, the officer attempted to get the pickup truck to stop. The pickup truck led the officer through a number of residential neighborhoods, first appearing to stop and then driving off again. Ultimately, the officer was standing in front of the truck and ordering it to stop, when the truck suddenly headed directly toward him. He fired a shot and killed the driver.

The investigation of the Internal Affairs Division of the Arlington Police Department exonerated the officer on the charge of using excessive force. It did state, however, that "[a] review of Officer Lowery's actions shows no policy violations; *however, there were tactical errors that might have possibly affected the outcome of the incident.*" 957 F.2d at 1272 (emphasis supplied).

The plaintiffs based their case in part on the fact that the officer had not followed correct police procedures and had thereby created the dangerous situation. The opinion of the Fifth Circuit rejected that contention:

> The Plaintiffs have charged that the force Lowery employed was excessive, *at least in part because Lowery may not have followed established police procedures* in displaying his badge and identifying himself while in plain clothes. *The implication is that Lowery thereby manufactured the circumstances that gave rise to the fatal shooting.* We rejected a similar argument in *Young.* There, the district court found that the officer had acted negligently and contrary to good police procedure. . . . We found to the contrary, however, that *regardless of what had transpired up until the shooting itself,* Young's movements gave the officer reason to believe, at that moment, that there was a threat of physical harm.

957 F.2d at 1275–76 (emphasis supplied). "Regardless of what had transpired up until the shooting itself" in the present case, the calculated decision of Preston Barnes to attempt to flee

from lawful detention and to drive his car into Sergeant Pagotto's body created a new and overriding reality.

■ In all of these cases, the claim that an officer has unreasonably used excessive force must be assessed as of the moment when the force is employed. Antecedent and allegedly negligent acts that may have contributed to the creation of a dangerous situation are not pertinent in evaluating the officer's state of mind at the critical moment when the gun, for instance, is discharged. In most of the § 1983 cases reviewed, moreover, the ultimate decision of the officer was intentionally to pull the trigger and intentionally to kill the person the officer believed to be an actual or imminent assailant. In the present case, by contrast, we are dealing with no such intentional shooting or killing. Sergeant Pagotto's weapon discharged only when the white Subaru was deliberately driven into the Sergeant's body.[11] It cannot be that the accidental discharge of a weapon would be deemed more blameworthy than the intentional shooting of the victim. All that the Sergeant's alleged negligence did was, at most, to bring his body and his hand holding his service weapon into sufficient proximity of the white Subaru so that the white Subaru could more readily be driven into him and it. That is not a criminal *mens rea.*

### The Legal Sufficiency of the Evidence

In reaching a final holding with respect to the legal sufficiency of the evidence, it is, of course, required that we take

---

**11.** In saying that the car was "deliberately" driven into Sergeant Pagotto's body, we are not saying that Preston Barnes's primary purpose or motive was to ram the automobile into the Sergeant. Barnes's undisputed primary purpose or motive was to make a vehicular getaway from the scene. A parked car blocked forward movement in the parking lane. The getaway, therefore, necessarily involved leftward lateral movement into the traveled southbound lane. From the hand-to-hand contact between them, Barnes either knew or should have known that the automotive force of the leftward lateral movement would have the inevitable effect of pushing Sergeant Pagotto's body out of the way. It is in this sense that we say that the car deliberately hit him. He was deliberately hit (sideswiped) because he was in the way.

that version of the evidence most favorable to the State's case. That version was succinctly summed up by the Assistant State's Attorney in the course of his closing argument to the jury:

[A] police officer, the Defendant in this case, introduces a loaded, Glock semi-automatic pistol which has no manual safeties. It's chambered and prepared to be fired as soon as the trigger is pulled. This Defendant introduces this fully loaded weapon with his finger not where he's trained to have it. He introduces it in a manner contrary to the way he's been trained to handle it into a situation where it is foreseeable that he may receive resistance.

He closes with the gun in his hand with his finger in the wrong place, opens the door to a moving vehicle and attempts to drag the driver of the vehicle out with one hand. Now is anyone here surprised that this weapon discharged under those circumstances? Is anyone here surprised that when the weapon is discharged, being highly dangerous, it struck and killed an individual, in this case Preston Barnes the driver?

That version of the evidence shows three or four possible deviations from or violations of departmental guidelines of the Baltimore City Police Department. It shows that the actions of Sergeant Pagotto may well have contributed to the creation of a dangerous confrontation between himself and Preston Barnes. It shows what may be a case of actionable civil negligence.

We hold that it does not show, however, such a departure from the norm of reasonable police conduct that it may fairly be characterized as "extraordinary and outrageous." We hold that it does not show on the part of the law enforcement officer, even if guilty of some negligence in the performance of his duties, a *mens rea* that qualifies as a "wanton and abandoned disregard of human life." The burden of production with respect to gross criminal negligence was not satisfied.

### Preston Barnes's Getaway Attempt As An
### Independent Intervening Cause

Even though in a criminal case, unlike a tort case, the clear contributory negligence of Preston Barnes may not have been efficacious as a defense, *Duren v. State,* 203 Md. 584, 593–94, 102 A.2d 277 (1954), it is not utterly bereft of significance. The seminal discussion of proximate causation by Rollin Perkins and Ronald Boyce, *Criminal Law* (3d ed.1982), pp. 774–825, makes it clear that the negligence of the deceased, which in tort law would be contributory negligence, might well qualify in a criminal case as a superseding or supervening cause of death:

> It must not be assumed that negligence of the deceased or of another is to be entirely disregarded. Even though the defendant was criminally negligent in his conduct *it is possible for negligence of the deceased* or another *to intervene between this conduct and the fatal result in such a manner as to constitute a superseding cause,* completely eliminating the defendant from the field of proximate causation.

(Footnote omitted; emphasis supplied).

Our primary holding in this case is that the evidence was not legally sufficient to permit a finding of such a wanton and reckless disregard of human life on the part of Sergeant Pagotto as to raise what might arguably be ordinary civil negligence to the possible level of that gross criminal negligence necessary to support the conviction for involuntary manslaughter and the convictions for reckless endangerment.

■ As a completely alternative holding, we also conclude that when Preston Barnes put into motion his predetermined tactic of attempting a vehicular getaway from the detention scene, that criminal act on his part constituted an independent intervening cause that resulted in his own death.

In terms of the necessity of proving the causative link between a defendant's gross negligence and the victim's death, the Maryland manslaughter case of *Craig v. State,* 220 Md. 590, 155 A.2d 684 (1959), is very instructive. The central

message in *Craig* is that "in order to sustain a conviction of involuntary manslaughter, the gross and criminal negligence must be the proximate cause of death." 220 Md. at 597, 155 A.2d 684.

A Washington County jury convicted Ollen and Lillian Craig, husband and wife, of the involuntary manslaughter of their six-month-old baby. They were charged with gross negligence in failing to provide necessary medical care over the course of an eighteen-day illness that grew progressively worse and ultimately proved fatal. The cause of death was advanced pneumonia in both lungs. The Washington County medical officer testified that the early use of penicillin alone "would probably have cured the child" and that if antibiotics had been administered at any time during the first week of the child's illness, there would have been "a very good chance of recovery."

The Court of Appeals reversed the manslaughter conviction. It reasoned that the failure of the parents to obtain medical care for the baby during the early stages of the illness caused the death. It found no evidence, however, to show that the "seriousness of the child's illness was apparent" to the defendants. Even if they were guilty of ordinary civil negligence at that stage, the Court reasoned, the negligence at that stage was not gross and criminal:

> It seems unquestionably true that pneumonia caused the child's death, and that the deleterious and deadly effects of pneumonia are caused by organisms which, generally, may be controlled if treated by antibiotics in the early stages of the disease. But, in this case, we have no testimony that the seriousness of the child's illness was apparent to the parents until the last two or three days of the child's life, when, according to the medical testimony, the antibiotics would probably have been ineffective to save the child.

220 Md. at 598, 155 A.2d 684. The Court of Appeals operated on the assumption that the parents were, indeed, guilty of ordinary negligence in failing to obtain care. It could not

characterize that mere negligence, however, as a wanton or reckless disregard for the baby's life:

> *If we assume that* ordinarily careful and prudent parents would have called in medical aid during the initial stages of the child's illness, and, therefore, *the defendants were guilty, at this time, of ordinary negligence* in failing to call in a physician, *we still find nothing* in the testimony *that would sustain a finding that* during this early period of the child's illness *the parents displayed "a wanton or reckless disregard for" the child's life.*

*Id.* (emphasis supplied).

The Court then took as its working assumption the fact that the seriousness of the child's illness was so apparent to the parents during the last two or three days of its life that their failure to obtain medical aid at that time did, indeed, constitute gross criminal negligence. The critical question, therefore, became that of whether the gross criminal negligence was the proximate cause of the child's death:

> [N]o matter how regrettable the child's death, nor how gross the defendants' negligence may have been, the defendants cannot be held criminally responsible unless there were a causal connection between their negligence and the death that ensued.

*Id.*

 The ultimate holding of the Court of Appeals was that the gross negligence was not the proximate cause of death because prompt intervention at that late hour would probably have come too late to save the child's life:

> *[I]f we assume that* the seriousness of the child's illness was easily discernible to them in the last two or three days of its life, so that *their failure, at that time, to call in medical aid did constitute gross negligence, the record fails to disclose that this failure was the proximate cause of the child's death,* because ... the doctors stated that it would then have probably been ineffective to control the disease.

220 Md. at 598–99, 155 A.2d 684 (emphasis supplied). On the subject of proximate causation in an involuntary manslaughter

case, *see also Palmer v. State*, 223 Md. 341, 352–53, 164 A.2d 467 (1960). The lesson of *Craig v. State* is clear that antecedent ordinary negligence does not become gross negligence just because it contributes to a death. It must already be gross before it even enters into the causation equation.

In this case, moreover, a dramatic and unforeseen event occurred a critical few seconds before the fatal shot was fired. Although Preston Barnes started to execute his flight plan just a moment or two before Sergeant Pagotto's gun discharged, the chronological sequence is nonetheless clear that the "revving up" of the motor and the initial acceleration of the Subaru literally preceded the discharge of the weapon, even if but briefly. The State never disputed the testimony of Damien Jackson that he and Preston Barnes had on much earlier occasions discussed the very escape plan that Barnes put into execution on the night of February 7, 1996. It was clear from the testimony of Damien Jackson that even as Sergeant Pagotto was approaching the driver's door, the gears and brakes and accelerator were in a state of readiness for the sudden activation of the getaway plan.

Critical to the status of the getaway as an independent intervening cause, however, is the fact that the beginning of the execution of the plan literally have preceded the discharge of the weapon. Even if the jury rejected Sergeant Pagotto's testimony that his gun went off only when the Subaru crashed into it and his hand hit the left rear window, that version of the evidence given by the State's witnesses yields the very same sequence of events. Officer Wagner testified that he heard the car start up, that he saw it "start moving a little quicker," that he saw Sergeant Pagotto's "right side ... pressed against the car," and that he ran back to get the police cruiser before he heard the gunshot.

Damien Jackson referred to Preston Barnes's execution of his escape plan as a case of "pulling off." His version of events was that Barnes "pulled off" before the shot was fired:

Q: Now, when you say he pulled off you mean Preston?

A: Yes.

Q: At the time he pulled off where was the officer?

A: Well, the whole time, like I say the car was still drifting, the officer was beside the car still trying to get him to stop it.

Q: Okay. *What happened after he pulled off?*

A: *I heard a shot.*

(Emphasis supplied).

Ali Austin testified clearly that the Subaru's engine "revved up" before the fatal shot was fired:

Q: Do you remember hearing the engine rev up?

A: Yes.

Q: I'm sorry?

A: Yes.

Q: That means that somebody was applying gas to it, right?

A: I guess so.

Q: Okay. And *that was before the shot?*

A: *Before the shot.*

Q: *Before you heard the shot you heard the engine rev up?*

A: *Yeah, yes.*

(Emphasis supplied).

From the State's version of the events of February 7, 1996, it is clear that the dominant influence over those events—the precipitant, the catalyst—was from start to finish the pervasively criminal behavior of Preston Barnes. From the very moment when his Subaru was directed to pull to the curb, his criminality—past, present, and future—controlled the course of those events.

His past criminality supplied the purpose and the motive for what ensued. He was still on probation for an earlier drug conviction and a violation of that probation could have meant five years of imprisonment that would have to be served. It was that shadow from the past that triggered Barnes's first reaction to being stopped, "Oh, shit. I'm dirty."

His present criminality, as of the moment of the stop, was not the trivial inconsequence of a license tag violation. Preston Barnes was at that moment in possession of ten bags of cocaine, known as "Ready Rock," which he had picked up from his obvious "stash," the home of his girlfriend, just a few minutes earlier. From the amount of the drugs and from the fact that he and Damien Jackson had been selling drugs the day before, the clear implication is that Preston Barnes was guilty of the possession of contraband narcotics with the intent to sell in violation of Art. 27, § 286(a)(1). Not even factoring in any possibility of enhanced punishment because of the earlier drug conviction, a violation of § 286(a)(1) threatened a felony conviction with a maximum sentence of up to twenty years. That present reality precipitated resort to the getaway plan, a few moments in the future, which Barnes and Damien Jackson had discussed off and on over a period of months.

It was Preston Barnes's future criminality measured from that moment, the imminent implementation of his getaway plan, that became the independent intervening cause of his own death. He never complied with the repeated orders from Sergeant Pagotto and Officer Wagner to stop the car, to put on the emergency brake, and to put his hands in clear view on the dashboard. The slow forward drift of the Subaru, keeping slightly ahead of Sergeant Pagotto's approach, was a game of "cat and mouse." When Sergeant Pagotto reached with his left hand into the passenger compartment, Preston Barnes presumed to struggle with him rather than to comply with a lawful command.

It was, however, the acceleration of the vehicle and its leftward movement into Sergeant Pagotto's body that became the ultimate precipitating event. That Preston Barnes may at that moment have been guilty of the common law misdemeanor of resisting arrest is beside the point. He was at that moment perpetrating other and more serious crimes. One of them, the driving (even by way of sideswiping) of 2,500 pounds of metal into Sergeant Pagotto's body was, *inter alia*, a clear case of reckless endangerment in violation of Art. 27, § 12A–2(a)(1).

The leftward movement of the Subaru that knocked Sergeant Pagotto to the roadbed, as testified to not only by the Sergeant but also by Officer Wagner, was no mere common law assault and battery. Still on the books on February 7, 1996 was Art. 27, § 386, which in pertinent part provided:

> *If any person ... shall assault or beat any person ... with intent to prevent the lawful apprehension or detainer of any party for any offense for which the same party may be legally apprehended or detained,* every such offender ... shall be guilty of a felony.

(Emphasis supplied).

At the very moment the gun went off, Preston Barnes was committing an assault with the intent to prevent his own lawful detention. That statutory felony, originally enacted in 1853, carried a maximum sentence of fifteen years and remained on the books until the recodified assault provisions took effect on October 1, 1996. Ironically, if, as the Subaru was pushing into him, Sergeant Pagotto had actually shot with the intent to kill, he might still have had a plausible case of justifiable self-defense. *See Drewitt v. Pratt,* 999 F.2d 774 (4th Cir.1993) and *Fraire v. Arlington,* 957 F.2d 1268 (5th Cir.1992), both discussed *supra.*

The crashing of the Barnes-driven automobile into the Sergeant's gun hand was an unforeseen and intervening event that took on a causative life of its own. *Owens v. Simon,* 245 Md. 404, 409–12, 226 A.2d 548 (1967). *See also Commonwealth v. LaPorta,* 218 Pa.Super. 1, 272 A.2d 516 (1970).

\* \* \* \* \*

We hold that the evidence was not legally sufficient to permit a finding of gross criminal negligence on the part of the appellant and that the charge of manslaughter, therefore, should not have been submitted to the jury. For the same reason, we also hold that the charges of reckless endangerment should not have been submitted to the jury. Alternatively, we hold that the evidence was not legally sufficient to permit a finding that any action of the appellant, even if

assumed to have been grossly negligent, was the proximate cause of the decedent's death and that the charge of manslaughter, therefore, should not have been submitted to the jury. In view of our disposition of the case on the ground of the legal insufficiency of the evidence, it is unnecessary to consider the appellant's other contentions.

*JUDGMENTS REVERSED; COSTS TO BE PAID BY MAYOR AND CITY COUNCIL OF BALTIMORE.*